# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| P.S., A MINOR, BY HIS PARENT J.S., | : | CIVIL ACTION NO. |
| Plaintiff, | : | 3:01-CV-1757 (GLG) |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| THE BROOKFIELD BOARD OF | : | |
| EDUCATION, | : | |
| Defendant. | : | DECEMBER 19, 2003 |

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 7(a) of the Local Rules of Civil Procedure, the defendant, Brookfield

Board of Education ["the Board"], hereby submits this memorandum of law in support of its

Motion for Summary Judgment, which is filed herewith. With its motion and this memorandum,

and in conjunction with the statement of undisputed material facts also submitted herewith, the

Board respectfully requests that this court enter summary judgment on its behalf with respect to

the sole count of the plaintiff's September 11, 2001 Complaint. In that Complaint, the plaintiffs

attempt to state a cause of action in the form of an administrative appeal under the Individuals

with Disabilities Education Act, specifically 20 U.S.C. §1415(i)(2) thereof ["IDEA"], from a

final decision in an administrative, special education due process hearing. More specifically, the

plaintiffs demand that this court reverse Final Decision and Order 99-026, which was issued on

*LAW OFFICES* • **SULLIVAN, SCHOEN, CAMPANE & CONNON, LLC** • 646 PROSPECT AVENUE • HARTFORD, CONNECTICUT 06105-4286 • (860) 233-2141
JURIS NO. 62326

July 30, 2001 by a State of Connecticut Department of Education hearing officer.  The plaintiffs'

claims, however, find no support either in the undisputed material facts or in the applicable law.

More specifically, there is no cognizable basis for the plaintiffs' conclusory assertions that the

hearing officer erred in dismissing the parents' hearing request.

In stark contrast, the facts, including the parents' own sworn testimony, clearly establish

that the parents intentionally and admittedly prevented the Board from evaluating P.S. on the

advice of their attorney because they were afraid they would not like the results of the

evaluation.  Both federal and state law mandates an evaluation prior to determining a child's

eligibility for special education services.  In turn, eligibility must be established prior to the

provision of special education programming and placement.  Consequently, the parents' refusal

to allow the Board to evaluate P.S. thwarted the Board's attempts to determine P.S.'s eligibility

for special education and, if he were deemed eligible, deprived the Board of the opportunity to

formulate appropriate educational programming and to determine an appropriate placement in

the least restrictive environment.

The IDEA expressly provides that if the Board notifies parents of its intent to evaluate

their child but the parents refuse to make him available for that evaluation and instead

unilaterally place him, reimbursement for the cost of that unilateral placement can be denied.  20

U.S.C. §1412(a)(10)(C)(iii)(II); 34 C.F.R. §300.403(d)(2).  Additionally, the IDEA permits the

denial of such reimbursement based upon "a judicial finding of unreasonableness with respect to

2

actions taken by the parents." 20 U.S.C. §1412(a)(10)(C)(iii)(III); 34 C.F.R. §300.403(d)(3).
The parents predicated this case, as well as the underlying hearing, upon the Board's purported
failure to evaluate, identify, program for and place P.S. despite the fact that they refused to make
P.S. available for an evaluation, even when ordered to do so by the administrative hearing
officer.    Thus, the parents deprived the Board of any opportunity to evaluate, and
consequentially, to take any further steps with respect to P.S.'s possible identification,
programming and placement. As such, the parents' actions were patently unreasonable.

I.    **UNDISPUTED MATERIAL FACTS**

P.S. has a birth date of June 20, 1983 and is currently 20 years old. Exhibit A, p. 1.[1]
Prior to December 8, 1998, P.S. had been attending Immaculate High School, a parochial
secondary school located in Danbury, Connecticut. Exhibit A, p. 2; Exhibit B, pp. 36-37. In
November 1998, however, P.S. was having increasing difficulties functioning at Immaculate, the
result, his doctors believed, of petit mal epilepsy. Exhibit C, p. 28. See also Exhibit B, p. 38.

On December 3, 1998, P.S.'s neurologist, Dr. Victor E. Ylagan, wrote to the Assistant
Principal of Immaculate High School to recommend that P.S. receive homebound instruction.
Exhibit D.  Subsequently, on December 8, 1998, P.S.'s parents enrolled him in the Brookfield
Public Schools solely for the purpose of obtaining a home tutor. Exhibit A, p. 2; Exhibit C, pp.

---

[1]The exhibits cited herein are more specifically described in and are appended to the Board's Local Rule 56(a)
Statement, which is filed herewith.

3

28-29. On the December 8, 1998 Registration Form, his mother indicated that P.S. had petit mal epilepsy and needed "homebound education until his seizures are at a point where he can concentrate again in school." Exhibit A, p. 2.

On December 14, 1998, the Board assigned Beth Nanna to provide P.S. with homebound instruction. Exhibit E. See also Exhibit C, p. 128. Ms. Nanna was a special education teacher at Brookfield High School. Exhibit C, p. 128. Ms. Nanna contacted P.S.'s parents on December 14, 1998, the same day that she was assigned to be P.S.'s tutor. Exhibit E. P.S.'s parents had admitted him to Norwalk Hospital earlier that day at Dr. Ylagan's recommendation for four days of video EEG tests designed to confirm whether P.S. had epilepsy. Exhibit B, pp. 38-39; Exhibit C, p. 30. Consequently, the parents informed Ms. Nanna that they would notify her when they required her services. Exhibit E.

On December 17, 1998, Norwalk Hospital ruled out epilepsy as a diagnosis and instead transported P.S. to Yale Psychiatric Hospital, where he remained until he was discharged on January 5, 1999 with a diagnosis of Schizophreniform Disorder. Exhibit F, pp. 18-19, 48; Exhibit G, p. 1. During the week beginning January 4, 1999, Ms. Nanna again contacted P.S.'s parents to determine when she could commence tutoring. Exhibit E. The parents informed her that she could start as of January 10, 1999, and tutoring did, in fact, begin following P.S.'s return home. Id. See also Exhibit C, pp.31-32.

LAW OFFICES • SULLIVAN, SCHOEN, CAMPANE & CONNON, LLC • 646 PROSPECT AVENUE • HARTFORD, CONNECTICUT 06105-4286 • (860) 233-2141
JURIS NO. 62326

Ms. Nanna used P.S.'s textbooks from Immaculate High School during the tutoring. Exhibit C, pp. 32-33. P.S. made good progress in the tutoring and obtained good grades on his assignments. Exhibit H, p. 1. In fact, P.S.'s mother believed Ms. Nanna was "very good" and "could get [P.S.] through the lesson pretty well." Exhibit C, p. 32. On January 19, 1999, however, Immaculate High School refused to provide Ms. Nanna with Peter's midterm examinations for her to administer. Exhibit E. When Ms. Nanna notified Malinda Murchie, the Board's Director of Special Education, about this on January 20, 1999, Ms. Murchie directed Ms. Nanna to refer P.S. for evaluations to determine whether he was eligible for special education services. Id.

On January 27, 1999, the Board scheduled and notified the parents of a referral Planning and Placement Team ["PPT"] meeting for February 10, 1999. Exhibit I, p. 1. On the Notice, the Board stated that the purpose of the meeting was to: "Discuss the referral for consideration of preplacement evaluations." Id. The Board included with that Notice a copy of the parents' due process rights. Exhibit C, p. 91; Exhibit J.

At the February 10, 1999 PPT meeting, the Board was seeking to evaluate P.S. for the purpose of determining whether he was qualified for identification as a special education student. Exhibit C, p. 130. In conjunction with that goal, Mrs. Secola gave her consent for Peter to be evaluated in the following areas: emotional, cognitive, achievement and visual motor. Exhibit

LAW OFFICES • SULLIVAN, SCHOEN, CAMPANE & CONNON, LLC • 646 PROSPECT AVENUE • HARTFORD, CONNECTICUT 06105-4286 • (860) 233-2141
JURIS NO. 62328

K. Essentially, the PPT wanted to conduct psychiatric, psychological and academic testing. Exhibit F, p. 75.

At its February 10, 1999 meeting, the PPT noted: "[P.S.] is making educational progress with homebound instruction and the referral process to consider SED identification will be started." Exhibit L. Thus, the PPT decided: "The educational process is working for [P.S.], so the team recommends continuing with homebound instruction while additional assessments are done." Id. The Team reached this decision based upon input from Mrs. Secola, from the Immaculate High School representatives, and from Christopher Sorenson, who worked in Danbury Hospital's Center for Child and Adolescent Treatment Services ["CCATS"]. Id. See also Exhibit F, pp. 57-58.

At the February 10, 1999 PPT meeting, neither P.S.'s mother nor Mr. Sorenson would provide the Board with a copy of the Yale Psychiatric Institute's Discharge Summary. Exhibit C, p. 108. See also Exhibit G, p. 1. P.S.'s mother testified that the Yale Discharge Summary was simply a medical summary and did not address P.S.'s educational needs. Exhibit C, p. 73. In the summary, however, Yale noted that P.S.'s "parents have already begun the process of setting up home-bound tutoring as the first step back to school." Exhibit G, p. 2.

In 1997, the State of Connecticut Department of Education had promulgated *Guidelines for Identifying and Educating Students With Serious Emotional Disturbance*, which provide:

6

*LAW OFFICES* • **SULLIVAN, SCHOEN, CAMPANE & CONNON, LLC** • 646 PROSPECT AVENUE • HARTFORD, CONNECTICUT 06105-4286 • (860) 233-2141
JURIS NO. 62326

In December 1984, the Connecticut Department of Education issued a policy directive indicating that the local board of education remains responsible for a student's education when he or she is placed in a hospital due to emergency medical and/or psychiatric reasons. One *unintended* outcome of this policy has been that many students admitted to psychiatric hospitals have been automatically classified by Individualized Education Program Teams as students with serious emotional disturbance and eligible for special education by virtue of their hospitalization.

Frequently, students enter a psychiatric hospital without previously having been identified as eligible for special education and related services. A referral subsequent to such a placement is made to the school district by the student's parents or by hospital personnel. The district is then obligated to consider whether an evaluation is warranted under the circumstances to determine whether the child is eligible for special education. **The rights and procedures for evaluating the educational needs of a hospitalized student suspected of being eligible for special education are the same as for a student referred for evaluation within the school setting. The results of evaluations conducted by a psychiatric hospital may be accepted by the Individualized Education Program Team (IEP Team); however, the IEP Team assumes the responsibility of ensuring that the evaluation meets the standards for identifying any student suspected of having a disability.**

See 1997 State Department of Education *Guidelines for Identifying and Educating Students With Serious Emotional Disturbance,* the relevant portions of which are appended hereto as Exhibit U, p. 14 (italicized emphasis added; bold print emphasis in original).

On February 11, 1999, the day after the PPT meeting, the parents revoked their consent for the Board to evaluate P.S. Exhibit C, pp. 44, 66-67. The parents decision to revoke their consent was not based upon any concerns about the credentials of the Board's evaluators. Exhibit C, p. 66. To the contrary, the parents were afraid that the evaluators would recommend a

7

placement within the school district, so the parents' attorney simply advised them to not make P.S. available for the Board's evaluators. Id., pp. 44, 51-52, 66-67.

On February 11, 1999, the same day that the parents revoked their consent to the Board's evaluation of P.S., they informed Ms. Nanna that her tutorial services were no longer needed. Exhibit E. The parents then unilaterally placed P.S. in Danbury Hospital's ACCESS program in conjunction with the hospital's CCATS program on or about February 17, 1999. Exhibit F, pp. 46, 51. ACCESS is Danbury Hospital's education program and CCATS is its therapeutic program. Exhibit F, p. 88. P.S. was discharged from the CCATS program in April 1999. Id., pp. 46, 92.

Christopher Sorenson was P.S.'s case manager during the time P.S. was attending the Danbury Hospital programs. Exhibit F, p. 61. Mr. Sorenson was not licensed or certified as a psychologist, or a social worker, or a teacher. Id., pp. 87-89. Mr. Sorenson had a B.S. in Human Relations and his only certification was as a Chemical Dependency and Alcoholism counselor. Id., pp. 57, 87. Mr. Sorenson was not employed in the ACCESS education program, but in the CCATS treatment program, where he worked with children who had substance abuse problems, and where the focus of his work was therapeutic, not educational. Id., pp. 88-89. At Danbury Hospital, Mr. Sorenson was not involved in making education-based decisions. Id., pp. 93-94. In fact, during the hearing, Mr. Sorenson could not say that Danbury Hospital's ACCESS program was the most appropriate educational setting for P.S. Exhibit F, p. 100.

LAW OFFICES • SULLIVAN, SCHOEN, CAMPANE & CONNON, LLC • 646 PROSPECT AVENUE • HARTFORD, CONNECTICUT 06105-4286 • (860) 233-2141
JURIS NO. 62326

Dr. John Gelinas was the Medical Director of Danbury Hospital's CCATS therapeutic program. Exhibit M, pp. 13-14. Dr. Gelinas did not begin to treat P.S. on a private, one-to-one basis until April 1999, after he had been discharged from the CCATS program. Id., p. 20. Dr. Gelinas is not an expert in educational programs and did not provide any direct input with respect to educational placements for P.S. or for other students in the CCATS program. Exhibit M, pp. 25, 53. Dr. Gelinas never conducted any educational evaluations of P.S, did not know what methodology or instructional approach was employed with P.S. at ACCESS, never attended a PPT for P.S., and never provided the Board with an opinion regarding P.S.'s educational programming. Id., pp. 28-29, 86-88.

Dr. Gelinas's lack of involvement in P.S.'s educational programming was reflected in his testimony. Dr. Gelinas originally asserted on March 8, 2000 that it was not feasible to transition P.S. to a public school, even one that had the appropriate special education interventions. Exhibit M, p. 37. During cross-examination, however, Dr. Gelinas admitted that P.S. was enrolled full time at Immaculate High School. Id., pp. 74-76. Dr. Gelinas further acknowledged that he did not know what Immaculate's capabilities were with respect to special education interventions. Id.

Despite his medical issues, P.S. remained on course to graduate with his class at the conclusion of the 2000-2001 school year. Exhibit C, pp. 24-25, 49. In Spring 1999, P.S. attended classes at Danbury Hospital's ACCESS program. Id., p. 49. These courses used

9

Immaculate's textbooks and curriculum. Id.. P.S. was a junior during the 1999-2000 school year, and during the Fall 1999 semester attended Immaculate High School on a part-time basis. Exhibit C, pp. 23-24; Exhibit F, p. 49. That semester, P.S. took Religion and Spanish at Immaculate, in which he received, respectively, an A and a B+. Exhibit C, p. 25. During the Fall 1999 semester, P.S. also took courses in Danbury Hospital's ACCESS program using Immaculate's textbooks and curriculum, in which classes he maintained a B average. Id., pp. 26, 49. At the December 6, 1999 hearing, Mr. Sorenson, P.S.'s case manager in the CCATS program, testified that he believed P.S. was "going to be able to do well in school." Exhibit F, p. 84.

P.S. was a full-time student at Immaculate during the Spring 2000 semester. Exhibit C, pp. 23-24; Exhibit F, p. 49. Immaculate High School is a traditional, mainstream school. Exhibit N, pp. 41-42. When P.S. was at Immaculate during the 1999-2000 school year, he was in a regular classroom, which had approximately twenty students. Exhibit C, p. 24; Exhibit M, pp. 75-76. Dr. Robert S. Colen, a psychologist who had been retained by the parents, testified at the March 9, 2000 hearing that P.S. was doing well in his regular-classroom, mainstream setting at Immaculate. Exhibit N, p. 42.

After advising the parents on February 11, 1999 to revoke their consent to allow the Board to evaluate P.S., the parents' attorney referred them to Dr. Colen, which whom he had worked in previous cases, for an evaluation. Exhibit C, pp. 44, 66-67; Exhibit N, pp. 38-39. The

LAW OFFICES • **SULLIVAN, SCHOEN, CAMPANE & CONNON, LLC** • 646 PROSPECT AVENUE • HARTFORD, CONNECTICUT 06105-4286 • (860) 233-2141
JURIS NO. 62326

parents took P.S. to see Dr. Colen two weeks later, on February 25, 1999.  Exhibit N, p. 46.  As previously noted, at the February 10, 1999 PPT meeting, the Team recommended:  "The educational process is working for [P.S.], so the team recommends continuing with homebound instruction while additional assessments are done.  The team will reconvene at a later date to plan appropriate educational programming."  Exhibit L.  The parents or their attorney, however, nonetheless told Dr. Colen that the Board was seeking to place P.S. at its Alternative High School.  Exhibit N, p. 45.

On February 11, 1999, the parents' attorney requested via facsimile from the State of Connecticut Department of Education a due process hearing on their behalf, setting forth the following issues:

1.  Failure to timely evaluate.
2.  Denial of an appropriate program.
3.  Denial of an appropriate placement.

Exhibit O.  On March 4, 1999, the Board requested that the Hearing Officer issue an Interim Order directing Peter's parents "to make Peter available for a psycho-educational evaluation and a psychiatric evaluation conducted by evaluators of the Board's choosing and for which the Board will assume the cost."  Exhibit P, p. 1.  The parents never interposed an objection to the Board's motion, and on April 21, 1999 the hearing officer granted it.  Exhibit Q, p. 3, ¶8; Exhibit V.

11

On September 1, 1999, the hearing was convened. Exhibit B. At that hearing, P.S.'s mother testified that she preferred not to make P.S. available for an evaluation and would only do so if she absolutely had to. Exhibit B, p. 62. Subsequently, on November 30, 1999, the Board filed a Motion to Dismiss the hearing predicated upon the parents' failure and refusal to make P.S. available for evaluations. Exhibit Q, p. 4, ¶13; Exhibit R. The hearing officer did not immediately rule on the Board's dismissal motion, and hearings were held on December 2, 3 & 6, 1999 and on March 8 and 9, 2000. Exhibit Q, p. 1. The parents used these hearings to call their witnesses; the Board did not have the opportunity to commence its case or to call any witnesses. Exhibit S, p. 38.

At the March 8 and 9, 2000 hearings, the hearing officer reiterated his order that the parents make P.S. available for psychiatric and psycho-educational evaluations by the Board. Exhibit M, pp. 9-10; Exhibit N, pp. 3-4; Exhibit Q, p. 3, ¶8. Nonetheless, the parents never made P.S. available for an evaluation by the Board. Exhibit Q, p. 7, ¶7. See also Exhibit N, p. 4. By correspondence dated April 25, 2000, the Board requested through legal counsel that the hearing officer grant its November 30, 1999 Motion to Dismiss. Exhibit T. The Board reiterated its request by letters dated January 11, 2001, February 9, 2001, April 9, 2001 and April 30, 2001. Administrative Record, Exhibits AR-44; AR-46; AR-49; and AR-54.

On May 16, 2001, the hearing officer reconvened the hearing, at which time he heard legal argument on, *inter alia*, the Board's Motion to Dismiss. AR-54, p. 2; AR-57; Exhibit S, pp.

12

*LAW OFFICES* • **SULLIVAN, SCHOEN, CAMPANE & CONNON, LLC** • 646 PROSPECT AVENUE • HARTFORD, CONNECTICUT 06105-4286 • (860) 233-2141
JURIS NO. 62326

37-39. At that hearing, the parents argued that because P.S. would be graduating on June 5, 2001, the evaluation issue was moot and that the Board lacked jurisdiction to conduct an evaluation. Exhibit S, pp. 12-13. See also Exhibit Q, p. 6, ¶5. After hearing oral argument from the respective parties, the hearing officer ruled at the May 16 hearing that he was granting the Board's dismissal motion. Exhibit S, pp. 37-39. Subsequently, on July 30, 2001, the hearing officer issued Findings of Fact, Conclusions of Law, and a Final Decision and Order. Exhibit Q.

## II.    LEGAL STANDARD

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment shall be granted when the moving party sustains its burden of showing that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law. See also Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). In considering the appropriateness of summary judgment, the United States Supreme Court has held: "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules [of Civil Procedure] as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" Celotex Corp. v. Catrett, 477 U.S. at 327 (citing Fed. R. Civ. P. 1). In adjudging a motion for summary judgment, the "mere existence of factual issues -- where those issues are not material to the claims before the court -- will not suffice to defeat a motion for summary judgment." Quarles v. General Motors Corp., 758 F.2d 839, 840 (2nd Cir. 1985).

*LAW OFFICES* • **SULLIVAN, SCHOEN, CAMPANE & CONNON, LLC** • 646 PROSPECT AVENUE • HARTFORD, CONNECTICUT 06105-4286 • (860) 233-2141
JURIS NO. 62326

While it is true that "[i]f the party opposing summary judgment 'generates uncertainty as to the true state of any material fact, the procedural weapon of summary judgment is inappropriate,'" National Union Fire Ins. Co. v. Turtur, 892 F.2d 199, 203 (2nd Cir. 1989)(quoting Beacon Enterprises, Inc. v. Menzies, 715 F.2d 757, 762 (2nd Cir. 1983)), "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). Consequently, neither "conclusory statements, conjecture, [n]or speculation" will suffice to defeat summary judgment. Kulak v. City of New York, 88 F.3d 63, 71 (2nd Cir. 1996). Similarly, "[m]etaphysical doubt, conjecture, or surmise cannot . . . defeat the motion." Halpern v. Federal Bureau of Investigation, 181 F.3d 279, 287 (2nd Cir. 1999). In short, it is well established "that a summary judgment motion cannot be defeated by conclusory allegations, harsh invective, empty rhetoric, strained inferences, or unsupported conjecture. Collier v. City of Chicopee, 158 F.3d 601, 604 (1st Cir. 1998) (citing Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir.1990)). And, even when the underlying events in a case are not in genuine dispute, but the characterization and application of a legal test are disputed, the contested issue may still be ripe for adjudication by way of summary judgment. Newell Companies, Inc. v. Kenney Manufacturing Company, 864 F.2d 757, 763 (Fed. Cir. 1988), *cert denied,* 493 U.S. 814, 110 S. Ct. 62 (1989).

14

Administrative appeals brought pursuant to the Individuals with Disabilities Education Act, 20 U.S.C. §§1400 *et seq.*, ["IDEA"] are particularly susceptible to summary judgment. See, e.g., M.S., ex rel S.S. v. Board of Educ. of the City Sch. Dist. of the City of Yonkers, 231 F.3d 96 (2nd Cir. 2000); Walczak v. Florida Union Free Sch. Dist., 142 F.3d 119 (2nd Cir. 1998); Victoria L. by Carol A. v. District Sch. Bd. Of Lee County, Florida, 741 F.2d 269, 372-73 (11th Cir. 1984); Mr. & Mrs. H. v. Region 14 Bd of Educ., 46 F. Supp.2d 106 (D. Conn. 1999); Vander Malle v. Ambach, 667 F. Supp. 1015, 1033 (S.D.N.Y 1987), *modified on other grounds and aff'd*, 673 F.2d 49 (2nd Cir. 1982). Although summary judgment is generally adjudicated in the context of undisputed material facts, IDEA cases that present a mixture of law and fact may still be decided by summary judgment as such actions "are unusual in that an ample administrative record is placed before the district court for review." Bertolucci v. San Carlos Elementary Sch. Dist., 721 F. Supp. 1150, 1153 (N.D. Cal. 1989). See also Mavis v. Sobol, 839 F. Supp. 968, 987 n. 32 (N.D.N.Y. 1993).

### A.    The Standard Of Judicial Review In IDEA Cases

"The responsibility for determining whether a challenged IEP will provide a child with an appropriate public education rests in the first instance with administrative hearing and review officers." Walczak v. Florida Union Free Sch. Dist., 143 F.3d 119, 129 (2d Cir. 1998). The rulings of these hearing officers "are then subject to 'independent' judicial review." Id. (citing Hendrick Hudson School District Board of Educ. v. Rowley, 458 U.S. 176, 205 (1982)(quoting

LAW OFFICES • **SULLIVAN, SCHOEN, CAMPANE & CONNON, LLC** • 646 PROSPECT AVENUE • HARTFORD, CONNECTICUT 06105-4286 • (860) 233-2141
JURIS NO. 62326

in turn S. Conf. Rep. No. 94-455, at 50 (1975), *reprinted in* 1975 U.S. Code Cong. & Admin. News 1480, 1503)). "The Supreme Court has cautioned, however, that this 'independent' review 'is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities they review.'"  Walczak, 143 F.3d at 129 (quoting Rowley, 458 U.S. at 206).  To the contrary, "[t]he role of the reviewing court in making these assessments is circumscribed," Mr. and Mrs. H v. Region 14 Board of Educ., 46 F. Supp.2d 106, 109 (D. Conn. 1999), for "'[d]eference is owed to state and local agencies having expertise in the formulation of educational programs for the handicapped.'"  Garro v. State of Connecticut, 23 F.3d 734, 736 (2nd Cir. 1994)(quoting Briggs v. Board of Educ. of Connecticut, 882 F.2d 688, 693 (2nd Cir. 1989)).  "Indeed, the Second Circuit has stated that 'Rowley requires that federal courts defer to the final decision of the state authorities.'"  Mr. and Mrs. H., 46 F. Supp.2d at 109 (quoting Muller v. Committee on Special Education of the East Islip Union Free Sch. Dist., 145 F.3d 95, 101 (2nd Cir. 1998)).  Thus, courts "are expected to give 'due weight' to these [administrative] proceedings, mindful that the judiciary generally 'lack[s] the "specialized knowledge and experience" necessary to resolve "persistent and difficult questions of educational policy."'"  Walczak, 142 F.3d at 129 (quoting Rowly, 458 U.S. at 206, 208, quoting in turn San Antonia Indep. Sch. Dist. V. Rodriguez, 411 U.S. 1, 42 (1973))).  See also M.S., 231 F.3d at 102; Garro, 23 F.3d at 736; Mr. and Mrs. H., 46 F. Supp.2d at 109.

*LAW OFFICES* • **SULLIVAN, SCHOEN, CAMPANE & CONNON, LLC** • 646 PROSPECT AVENUE • HARTFORD, CONNECTICUT 06105-4286 • (860) 233-2141
JURIS NO. 62326

## III.    LEGAL ARGUMENT

### A.    The Hearing Officer Correctly Dismissed The Underlying Administrative Due Process Hearing Based Upon The Parents' Refusal To Permit The Board To Evaluate P.S.

As noted, in the present case the plaintiffs appeal the administrative hearing officer's dismissal of their special education due process hearing.    The parents requested that administrative hearing from the State of Connecticut Department of Education on February 11, 1999, the same day that they revoked their February 10, 1999 consent to permit the Board to evaluate P.S., the purpose of which evaluations was to determine whether he was eligible for special education services.  Exhibits K & O.  Despite revoking their consent to evaluate the day after they had granted it, the parents claimed as an issue in that hearing that the Board had failed to evaluate P.S. in a timely manner.  Exhibit O; Exhibit Q, p. 2.  Furthermore, despite the fact that the Board could not determine P.S.'s eligibility for special education until it evaluated him, and despite the fact that, in turn, it could not formulate educational programming and placement until it determined eligibility, the parents further claimed in the hearing that the Board had failed to provide an appropriate program for P.S. and had failed to provide an appropriate placement for P.S.  Id.; Id.

The Board convened a PPT meeting on February 10, 1999, the purpose of which was to "[d]iscuss the referral for consideration of *preplacement* evaluations."  Exhibit I (emphasis added).  The Notice and Consent to Conduct an Initial Evaluation that P.S.'s mother signed on

LAW OFFICES  •  SULLIVAN, SCHOEN, CAMPANE & CONNON, LLC  •  646 PROSPECT AVENUE  •  HARTFORD, CONNECTICUT 06105-4286  •  (860) 233-2141
JURIS NO.  62326

February 10, 1999 noted in relevant part that P.S. had "been referred for an evaluation *to determine eligibility for special education services*." Exhibit K (emphasis added). Additionally at the PPT meeting, having obtained the mother's' consent to evaluate P.S., the Team noted that "the referral process to consider SED identification will be started." Exhibit L. In short, the Board was seeking to evaluate P.S. in order to determine whether he was eligible for identification as a special education student. Exhibit C, p. 130.[2] The PPT then stated that once these assessments were completed, the Team would "reconvene . . . *to plan appropriate educational programming*." Id. (emphasis added).

The Team's decision to evaluate P.S. prior to determining whether he was entitled to special education programming or placement was mandated both by the IDEA and by its Connecticut state-law counterpart. The IDEA expressly states that a "local educational agency *shall conduct a full and individual initial evaluation . . . before the initial provision of special education and related services to a child with a disability*." 20 U.S.C. §1414(a)(1)(A)(emphasis added). Additionally, the regulations promulgated under the IDEA that were then in effect provide: "Before any action is taken with respect to the initial placement of a child with a disability in a program providing special education and related services, *a full and individual*

---

[2]Christopher Sorenson, who worked at CCATS and attended the February 10, 1999 PPT meeting on behalf of the parents, testified as a parents' witness at the underlying hearing that the PPT wanted to conduct psychiatric, psychological and academic testing. Exhibit F, pp. 57-58, 75; Exhibit L.

LAW OFFICES • **SULLIVAN, SCHOEN, CAMPANE & CONNON, LLC** • 646 PROSPECT AVENUE • HARTFORD, CONNECTICUT 06105-4286 • (860) 233-2141
JURIS NO. 62326

*evaluation of the child's educational needs **must** be conducted.*" 34 C.F.R. §300.531 (emphasis added).[3]

Connecticut similarly requires that "[e]ach child who has been referred and who may require special education and related services *shall* be evaluated in order to determine whether special education is required." Conn. Agencies Regs. §10-76d-9 (emphasis added). In fact, in Connecticut, the IEP *must* "be based upon the diagnostic findings of the evaluation study." Conn. Agencies Regs. §10-76d-11. This is in accordance with federal law, which provides: "In developing each child's IEP, the [PPT] . . . *shall* consider . . . the results of the initial evaluation." 20 U.S.C. §1414(d)(3)(A) (emphasis added).

If the Board had identified Peter at the February 10, 1999 PPT meeting without first conducting an evaluation, it would have violated the IDEA and Connecticut law. Instead, the Board acted appropriately, requesting and obtaining the parents' consent for an evaluation at the February 10, 1999 meeting. The parents, however, subsequently refused to allow the Board to evaluate Peter. It was a refusal that persisted throughout the course of the underlying hearing.

On March 4, 1999, the Board requested that the Hearing Officer issue an Interim Order directing Peter's parents "to make Peter available for a psycho-educational evaluation and a psychiatric evaluation conducted by evaluators of the Board's choosing and for which the Board

---

[3] The IDEA regulations implemented in 1999 are similarly unambiguous, stating: "Each public agency *shall conduct a full and individual initial evaluation* . . . before the initial provision of special education and related services to a child with a disability." 34 C.F.R. §300.531(emphasis added).

19