will assume the cost." Exhibit P, p. 1. The IDEA expressly empowers a hearing officer to "rule

on motions and other issues at any stage of the proceedings." 34 C.F.R. §300.583(h). See also

A.P. v. Regional School District #9 Board of Education, et al., Civil Action No. 3:96-CV-1154,

slip op. at 1 n. 1, 8-9 (D. Conn. March 29, 2000)(applying the almost identical language of the

pre-1999 IDEA regulations, Judge Arterton held "that the implementing regulations of the IDEA

explicitly permit hearing officers to issue partial final orders and interim orders")(quoting 34

C.F.R. §300.584(h)(1996)), a copy of which is appended hereto; Conn. Gen. Stat. §10-76h(c);

Conn. Agencies Regs. §10-76h-2(f). The parents never interposed an objection to the Board's

motion, and on April 21, 1999 the hearing officer granted it, writing:

> The Board's Request for an Interim Order to conduct evaluations of the student is
> GRANTED. The parents of the Student in the above referenced matter are directed to
> make the student available for a psycho-educational evaluation and a psychiatric
> evaluation conducted by evaluators of the Board's choosing for which the Board will
> assume the cost.
>
> These evaluations should be done as quickly as possible in order to avoid any further
> need for continuances. The parents' attorney should instruct the parents to comply with
> this order.

Exhibit V (emphasis in original). See also Exhibit Q, p. 3, ¶8.

Despite the hearing officer's April 21, 1999 Order, the parents did not produce P.S. for

the Board's evaluations. To the contrary, at the September 1, 1999 hearing, P.S.'s mother

testified that she would only make P.S. available for a Board evaluation if she absolutely had to.

LAW OFFICES • SULLIVAN, SCHOEN, CAMPANE & CONNON, LLC • 646 PROSPECT AVENUE • HARTFORD, CONNECTICUT 06105-4286 • (860) 233-2141
JURIS NO. 62326

Exhibit B, p. 62.[4]  At the March 8 and 9, 2000 hearings, the hearing officer reiterated his order that the parents make P.S. available for psychiatric and psycho-educational evaluations by the Board.  Exhibit M, pp. 9-10; Exhibit N, pp. 3-4; Exhibit Q, p. 3, ¶8.  Nonetheless, the parents persisted in their refusal to do so.  Exhibit Q, p. 7, ¶7.  See also Exhibit N, p. 4.  In fact, as of the May 16, 2001 hearing date, at which the hearing officer stated his intention to grant the Board's November 30, 1999 Motion to Dismiss, the parents had still not permitted the Board to evaluate P.S.  Exhibit S, pp. 12-13.

During the underlying hearing, the parents' attorney unsuccessfully attempted to insinuate that the parents revoked their consent based upon concerns about the credentials of the Board's evaluators.  The parents' testimony, however, clearly established that the credentials of the Board's evaluators had played no role whatsoever in their decision to revoke consent.  For example, when the parents' attorney first sought to suggest the existence of these purported concerns, the following colloquy occurred between him and his own client, P.S.'s mother:

> Q.    Did you believe, in reflection, after reading your rights and talking to counsel, that you had a right to have an evaluation by a person with different credentials?
>
> A.    I didn't really think about the credentials, either way.

---

[4]Of note is the fact that the hearing officer expressly stated as part of his April 21, 1999 Order: "The parents' attorney *should instruct the parents to comply with this order*."  Exhibit V (emphasis added).  Over seven months later, however, when P.S.'s mother was asked at the December 2, 1999 hearing whether she was aware of the Board's March 4, 1999 Motion for Interim Order, she responded: "Actually, not.  At that point, I was letting the attorney handle all the technical things."  Exhibit C, p. 80.  Nonetheless, following the December 2, 1999 hearing, the parents continued in their refusal to comply with the hearing officer's order.  Exhibit B, p. 62; Exhibit Q, p. 7, ¶7; Exhibit N, p. 4.

*LAW OFFICES* • **SULLIVAN, SCHOEN, CAMPANE & CONNON, LLC** • 646 PROSPECT AVENUE • HARTFORD, CONNECTICUT 06105-4286 • (860) 233-2141
JURIS NO. 62326

Exhibit C, p. 66. Furthermore, when the parents' counsel made another attempt to induce the

mother to testify to such concerns, he obtained a similar result:

> BY MR. LAVIANO:
>
> Q.    Do you still believe that you wanted a person with more credentials than a school psychologist to evaluate [P.S.]?
>
> A.    I really wasn't thinking about credentials that much. I was thinking . . .
>
> Q.    *Well, think about it now.*
>
> MR. MCKEON:    I object.
>
> . . . .
>
> HEARING OFFICER ROSADO: Counsel, it's not that the witness is answering your question. You're instructing her how to answer it. Let her finish . . . .
>
> A.    I wasn't thinking about credentials.

Id., pp. 77-78 (emphasis added).

During the underlying administrative hearing, the parents also attempted to assert that

they rejected the Board's evaluators because P.S. had a psychiatric condition and the Board's

proposed evaluators were not psychiatrists. Exhibit C, pp. 62-63. As noted, Mr. Sorenson, who

both attended the February 10, 1999 PPT meeting and testified at the underlying hearing on

behalf of the parents, testified that the PPT essentially wanted to conduct psychiatric,

psychological and academic testing. Exhibit F, p. 75. Furthermore, in its March 4, 1999 Motion

for Interim Order, the Board requested:

LAW OFFICES  •  SULLIVAN, SCHOEN, CAMPANE & CONNON, LLC  •  646 PROSPECT AVENUE  •  HARTFORD, CONNECTICUT 06105-4286  •  (860) 233-2141
JURIS NO. 62326

an Interim Order in the above-captioned case directing the parents of Peter Secola to make Peter available for a psycho-educational evaluation *and a psychiatric evaluation* conducted by evaluators of the Board's choosing and for which the Board will assume the cost. These evaluations are necessary in order to enable the Board to assess whether Peter should be identified as a student entitled to special education services and, if such identification is warranted, the appropriate program for him.

Exhibit P, p. 1 (emphasis added). The parents did not interpose an objection to the Board's March 4, 1999 Motion, and the hearing officer granted it on April 21, 1999, ordering in relevant part: "The parents of the Student . . . are directed to make the student available for a psycho-educational evaluation *and a psychiatric evaluation* conducted by evaluators of the Board's choosing for which the Board will assume the cost." Exhibit V (emphasis added). See also Exhibit Q, p. 3, ¶8. The parents, however, ignored the hearing officer's Order, including his directive that "[t]hese evaluations should be done as quickly as possible." Id.

The parents' claim that they revoked consent because P.S. had a psychiatric condition and therefore had to be evaluated by a psychiatrist is further belied by the fact that two weeks after their revocation the parents had him evaluated by Dr. Robert Colen, whom they knew to be a psychologist, *not* a psychiatrist. Exhibit C, pp. 51, 66-67, 74; Exhibit N, pp. 9, 46. Finally, although the parents' attempted to disparage the nature of the evaluations to which they had originally consented at the February 10, 1999 PPT meeting, in recommending assessments in the areas of "emotional . . . cognitive . . . achievement . . . [and] visual motor," Exhibit K, the Board was simply following the State Department of Education's *Guidelines for Identifying and*

*LAW OFFICES* • **SULLIVAN, SCHOEN, CAMPANE & CONNON, LLC** • 646 PROSPECT AVENUE • HARTFORD, CONNECTICUT 06105-4286 • (860) 233-2141
JURIS NO. 62326

*Educating Students with Serious Emotional Disturbance*, which provide: "[A]n evaluation to determine a condition of serious emotional disturbance will require . . . data concerning the student's emotional/behavioral status, intellectual/developmental functioning, and educational progress." Exhibit U, pp. 14-15.

The parents also argued during the hearing that they were concerned that permitting the Board to evaluate P.S. would threaten P.S.'s well-being. Their assertion, however, is once again belied by the fact that on February 25, 1999 -- only two weeks after the parents' February 11, 1999 revocation of their consent for the Board to evaluate P.S. and one week prior to the Board's March 4, 1999 Motion for Interim Order -- they took him to see Dr. Colen. Exhibit C, pp. 51, 66-67; Exhibit N, p. 46. Despite their purported concern about the potential adverse effects of further evaluations, the parents brought P.S. to Dr. Colen even though they did not know him or anything about his credentials; in fact, they were steered to Dr. Colen by their attorney, who had previously worked with Dr. Colen in another case. Exhibit C, p. 51; Exhibit N, pp. 38-39. Dr. Colen saw P.S. *five or six times* during February and March 1999, the same period of time during which the Board was seeking to conduct psycho-educational and psychiatric evaluations of P.S. and the parents were refusing to make him available because they supposedly were concerned that evaluations would be harmful. Id., p. 35. See also Exhibit ?; Exhibit N, pp. 38-39.

It is impossible to ascribe any credibility to the parents' position, one which the Fifth Circuit has expressly rejected. In Andress v. Cleveland Independent School District, 64 F.3d 176

24

(5th Cir. 1995), the trial court held that school districts had the right to use their own personnel to reevaluate students but added that there was an exception to this rule if "further testing by school officials would harm the child medically and psychologically." Id., at 178. The Fifth Circuit rejected the trial court's adoption of this exception, holding:

> The district court erred in creating this judicial exception to the rule. The district court cited no law in support of its position. Nothing in the statutes, regulations or caselaw supports such an exception. Therefore, we hold that *there is no exception to the rule that a school district has a right to test a student itself in order to evaluate or reevaluate the student's eligibility under IDEA.*

Id., at 178-79 (emphasis added). See also Schwartz v. The Learning Center Academy, 2001 WL 311247 *6 (W.D. MI. Jan. 17, 2001), a copy of which is appended hereto.

In the underlying hearing, the parents also attempted to argue that because P.S. had been in a psychiatric hospital the Board was required to identify him as emotionally disturbed despite the fact that the Board had not evaluated him. Exhibit N, pp 58-67. The parents based their argument on a policy directive that the State Department of Education had promulgated as Series 83-84 Memo No. 56. Id. The parents' attorney even went so far as to state on the record: "I do represent to [the hearing officer] that I checked with the State Department of Education this morning, who informed me that it is still in effect a[s] a directive." Id., pp. 60-61. In fact, in 1997, three years prior to that March 9, 2000 representation by the parents' attorney, the State Department of Education expressly repudiated the parents' interpretation of Series 83-84 Memo No. 56.

LAW OFFICES • SULLIVAN, SCHOEN, CAMPANE & CONNON, LLC • 646 PROSPECT AVENUE • HARTFORD, CONNECTICUT 06105-4286 • (860) 233-2141
JURIS NO. 62326

In its *Guidelines for Identifying and Educating Students With Serious Emotional Disturbance*, the Department of Education unambiguously stated:

> In December 1984, the Connecticut Department of Education issued a policy directive indicating that the local board of education remains responsible for a student's education when he or she is placed in a hospital due to emergency medical and/or psychiatric reasons. *One unintended outcome of this policy has been that many students admitted to psychiatric hospitals have been automatically classified by Individualized Education Program Teams as students with serious emotional disturbance and eligible for special education by virtue of their hospitalization.*

> Frequently, students enter a psychiatric hospital without previously having been identified as eligible for special education and related services. A referral subsequent to such a placement is made to the school district by the student's parents or by hospital personnel. The district is then obligated to consider whether an evaluation is warranted under the circumstances to determine whether the child is eligible for special education. **The rights and procedures for evaluating the educational needs of a hospitalized student suspected of being eligible for special education *are the same* as for a student referred for evaluation within the school setting. The results of evaluations conducted by a psychiatric hospital may be accepted by the Individualized Education Program Team (IEP Team); however, the IEP Team assumes the responsibility of ensuring that the evaluation meets the standards for identifying any student suspected of having a disability.**

Exhibit U, p. 14 (italicized emphasis added; bold print emphasis in original). In short, the fact that P.S. was in the Yale Psychiatric Institute would not, in and of itself, have been a sufficient basis upon which to be identified by the Board as emotionally disturbed. In any event, during the underlying hearing, P.S.'s mother testified that the Yale Discharge Summary was simply a medical summary and did not address P.S.'s educational needs. Exhibit C, p. 73.

26

None of these arguments that the parents raised in defending their refusal to make P.S. available for the Board's evaluations are supported by the facts or the law. And, during the hearing the parents freely admitted that the *actual* reason they revoked their consent was their concern that a Board evaluator would make a recommendation that they did not like. P.S.'s mother admitted: "We were, kind of, scared that, you know, their own evaluators would recommend him for their own in-district program, so we just wanted someone neutral." Exhibit C, pp. 51-52.[5] She further testified: "[Dr. Colen] doesn't have a pecuniary interest in that. I know that if the school keeps the kid in-district, it's cheaper for them, than to send a kid out of district. That's my understanding. Dr. Colen, what's it to him'"" Id., p. 54. In conjunction with that concern, P.S.'s mother also admitted under oath that they revoked their consent because their attorney had directed them to do so. Id., pp. 44, 66-67.

In dismissing the parents' due process hearing, the hearing officer concluded with respect to the parents' claim that the Board had not evaluated P.S. in a timely manner: "The Board was within the time limits to evaluate the student. The IEP process was stymied by the parents' withdrawal of their permission to evaluate the student, one day after permission had been given." Exhibit Q, p. 6, ¶5. As to the parents' claims that the Board had denied P.S. educational programming and an educational placement, the hearing officer concluded:

---

[5] As noted, despite the parents' assertion that they "wanted someone neutral" to evaluate P.S., two weeks after their attorney advised them to revoke their consent, he steered them to an evaluator, Dr. Colen, whom *they* did not know, but with whom *he* had previously worked on other cases. Exhibit C, p. 44, 51, 66-67; Exhibit N, pp. 38-39.

LAW OFFICES • SULLIVAN, SCHOEN, CAMPANE & CONNON, LLC • 646 PROSPECT AVENUE • HARTFORD, CONNECTICUT 06105-4286 • (860) 233-2141
JURIS NO. 62326

The parents' refusal to allow the Board to evaluate the student in a timely manner is the reason that an appropriate program and/or placement could not be provided to the student. Even after a ruling by the hearing officer to make the student available for evaluations the parents refused. At the September 1, 1999 hearing the parents again would not allow the Board to evaluate the student even though the student was already attending the private school that he had been attending before his illness.

Id., p. 7 ¶7. Based upon these conclusions, the hearing officer also rejected the parents' demand that the Board reimburse them for the cost of their unilateral placement of P.S. in the Danbury Hospital ACCESS program.

In dismissing the parents' due process request, the hearing officer cited 20 U.S.C. §§1412(A)(10)(B)(iii)(II-III), which provide:

The cost of reimbursement [for a unilateral placement in a private school] may be reduced or denied . . .

if, prior to the parents' removal of the child from the public school, the public agency informed the parents . . . of its intent to evaluate the child (including a statement of the purpose of the evaluation that was appropriate and reasonable), but the parents did not make the child available for such evaluation; or

upon a judicial finding of unreasonableness with respect to actions taken by the parents.

Id. See also 34 C.F.R. §§300.403(d)(2-3). It is undisputed in this case that at the February 10, 1999 PPT meeting, the Board provided notice to the parents of its intention to evaluate P.S. Exhibits I, K & L. In fact, the student's mother consented in writing to the administration of these evaluations. Exhibit K. Nonetheless, the very next day the parents withdrew their consent,

28

requested a due process hearing, and then unilaterally placed P.S. in an out-of-district, private

placement. Exhibit O.

The Second Circuit has repeatedly held that a school district is entitled to evaluate a child

by evaluators of its own choosing prior to providing special education programming. In Dubois

v. Conn. State Bd. of Educ., 727 F.2d 44 (2nd Cir. 1984), the court held:

> Before a school system becomes liable under the Act for special placement of a student, it
> is entitled to up-to-date evaluative data. See Zvi D. v. Ambach, 694 F.2d 904, 907 (2nd
> Cir. 1982)(no school system liability for unilateral placements by parents). Further, the
> school system may insist on evaluation by qualified professionals who are satisfactory to
> the school officials. Vander Malle v. Ambach, 673 F.2c 49, 53 (2nd Cir. 1982)(defendant
> school officials are "entitled to have [student] examined by a qualified psychiatrist of
> their choosing").

727 F.2d at 48.

A number of other circuit courts have similarly held that parties are not qualified for an

educational program under IDEA if they do not consent to an evaluation by the school district.

See, e.g., Tucker by Tucker v. Calloway County Bd. of Educ., 136 F.3d 495, 503-5 (6th Cir.

1998)(where school could not develop an appropriate educational plan for student because

parents' actions -- initially requesting a delay of implementation of the plan, and then informing

the school that they were withdrawing their son from school -- prevented it from doing so, school

did not violate IDEA); Johnson by Johnson v. Duneland Sch. Corp., 92 F.3d 554, 558 (7th Cir.

1996)("[B]ecause the school is required to provide the child with an education, it ought to have

the right to conduct its own evaluation of the student and the school cannot be forced to rely

29

solely on an independent evaluation conducted at the parents' behest"); Andress v. Cleveland Indep. Sch. Dist., 64 F.3d 176, 178 (5th Cir. 1995)("If a student s parents want him to receive special education under IDEA, they must allow the school itsel' to reevaluate the student and they cannot force the school to rely solely on an independent evaluation"); Gregory K. v. Longview Sch. Dist., 811 F.2d 1307, 1315 (9th Cir. 1987)("If the parents want Gregory to receive special education under the Act, they are obliged to permit such testing").

In Patricia P. v. Board of Education of Oak Park, 203 F.3d 462 (7th Cir. 2000), the Seventh Circuit held that "reimbursement under the act is subject to the parties cooperating in the placement process." Id., at 468 (citing Johnson v. Duneland Sch. Corp., 92 F.3d 554, 558 (7th Cir. 1996)). "Other circuits have also recognized that a parent's right to seek reimbursement for a unilateral placement of their child is available only upon a finding that, *after cooperating with the school district*, there are 'sufficiently serious procedural failures by the school district.'" Patricia P., 203 F.3d at 468 (quoting Doe v. Metropolitan Nashville Pub. Schs., 113 F.3d 384, 388 (6th Cir.), *cert. denied*, 119 S. Ct. 47 (1998))(emphasis added). See also Schoenfeld v. Parkway Sch. Dist., 138 F.2d 379, 380-82 (8th Cir. 1998); Ash v. Lake Oswego Sch. Dist., 980 F.2d 585, 589 (9th Cir. 1992).

In Patricia P., the Seventh Circuit discussed the importance for what it termed "a cooperative placement process." 203 F.3d at 468. The court noted: "Without some minimal cooperation, a school district cannot conduct an evaluation of a disabled child as is contemplated

LAW OFFICES • SULLIVAN, SCHOEN, CAMPANE & CONNON, LLC • 646 PROSPECT AVENUE • HARTFORD, CONNECTICUT 06105-4286 • (860) 233-2141
JURIS NO. 62326

under the IDEA." <u>Id.</u>  Consequently, "'[i]f a student's parents want him to receive special education under the IDEA, they must allow the school itself to reevaluate the student and they cannot force the school to rely solely on an independent evaluation.'" <u>Id.</u> (quoting <u>Andress</u>, 64 F.3d at 178).  Based upon this reasoning, the Seventh Circuit held "that parents who, because of their failure to cooperate, do not allow a school district a reasonable opportunity to evaluate their disabled child, forfeit their claim for reimbursement of a unilateral private placement." 203 F.3d at 469.  <u>See also</u> <u>Tucker</u>, 136 F.3d at 503-05.  Similarly, in <u>Schoenfeld v. Parkway Sch. Dist.</u>, 138 F.3d 379 (8th Cir. 1998), the Eighth Circuit held:

> Reimbursement for private education costs is appropriate only when public school placement under an individual education plan (IEP) violates IDEA because a child's needs are not met.  Since Parkway was denied an opportunity to formulate a plan to meet Scott's needs, it cannot be shown that it had an inadequate plan under IDEA.  Reimbursement for the costs of his private placement would therefore be inappropriate because school officials were excluded from the decision and because no showing of inadequate services under IDEA can be made.
>
> . . . .
>
> In these circumstances reimbursement for the expenses of his private education is not required even if it were assumed that private placement was appropriate to meet Scott's needs.

<u>Id.</u> at 382.

In the present case, the parents admit that they revoked their consent for the Board to evaluate P.S. the day after they had given it.  Exhibits K & O.  They admit that they did so because they were afraid they might not like the results and because their attorney told them to

LAW OFFICES  •  **SULLIVAN, SCHOEN, CAMPANE & CONNON, LLC**  •  646 PROSPECT AVENUE  •  HARTFORD, CONNECTICUT 06105-4286  •  (860) 233-2141
JURIS NO.  62326

do so.  Exhibit C, pp. 44, 51-54, 66-67.  During the hearing, the mother admitted that the parents would not make P.S. available for the Board's evaluations unless they absolutely had to.  Exhibit B, p. 62.  Yet, even when the hearing officer ordered that the parents make P.S. available so that the Board could administer psycho-educational and a psychiatric evaluations at Board expense, the parents simply ignored him.  Exhibit M, pp. 9-10; Exhibit N, pp. 3-4; Exhibit Q, p. 3, ¶8; Exhibit V.  At the same time, though, they were having him evaluated by Dr. Colen, a psychologist whom they did not know but to whom they were steered by their attorney because Dr. Colen had worked with him in a prior case.  Exhibit C, pp. 51, 66-67; Exhibit N, pp. 38-39, 46.

Despite their disingenuous and willfully uncooperative behavior, and in blatant disregard of the well-established and unambiguous IDEA statutory, regulatory and case law, the parents commenced and prosecuted -- albeit in a desultory fashion – the underlying due process hearing based upon the following issues:

1.    Failure to timely evaluate.
2.    Denial of an appropriate program.
3.    Denial of an appropriate placement.

Exhibit O.  That they did so in the administrative forum was extremely troubling, but their perpetuation of these same factually and legally insupportable arguments before this court is outrageous.  Public money that would be better spent on the educational needs of children within

LAW OFFICES • SULLIVAN, SCHOEN, CAMPANE & CONNON, LLC • 646 PROSPECT AVENUE • HARTFORD, CONNECTICUT 06105-4286 • (860) 233-2141
JURIS NO. 62326

the Brookfield Public Schools is instead diverted to address arguments that are so clearly without legal or factual merit as to warrant reprobation.

## IV.    CONCLUSION

Therefore, for the reasons set forth herein, as well as in the Board's accompanying Motion for Summary Judgment and Local Rule 56(a) Statement, the Board respectfully requests that this court enter summary judgment on behalf of the Board on the sole count of the plaintiff's Complaint and thereby affirm the July 31, 2001 Final Decision and Order 99-026 issued by the State of Connecticut Department of Education hearing officer in the underlying administrative, due process hearing.

THE DEFENDANT,
BROOKFIELD BOARD OF EDUCATION

By _____
Michael P. McKeon
Federal Bar No. ct02290
Sullivan, Schoen, Campane & Connon, LLC
646 Prospect Avenue
Hartford, Connecticut 06105-4286
Telephone: (860) 233-2141
Facsimile: (860) 233-0516
E-mail: mmckeon@sscc-law.com

33

## CERTIFICATION

This is to certify that a copy of the foregoing Memorandum of Law in Support of Defendant's Motion for Summary Judgment was sent via first-class mail, postage prepaid, on this 19th day of December 2003 to Jennifer D. Laviano, Esq., 77 Danbury Road, Suite C-6, Ridgefield, Connecticut 06877.

Michael P. McKeon

34