UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| P.S., A MINOR, BY HIS PARENT J.S., | : | CIVIL ACTION NO. |
| Plaintiff, | : | 3:01-CV-1757 (GLG) |
| | : | |
| v. | : | |
| | : | |
| THE BROOKFIELD BOARD OF | : | |
| EDUCATION, | : | |
| Defendant. | : | DECEMBER 19, 2003 |

### DEFENDANT'S LOCAL RULE 56(a) STATEMENT

Pursuant to Rule 56(a) of the Local Rules of Civil Procedure, the defendant, Brookfield Board of Education ["the Board"], hereby submits this Statement of Material Facts Not in Dispute.

1. P.S. has a birth date of June 20, 1983 and is currently 20 years old. 12/8/98 Brookfield Public Schools Registration Form, a copy of which was submitted in the underlying administrative hearing as Board Exhibit 2, but which is appended hereto as Exhibit A, p. 1.[1]

2. Prior to December 8, 1998, P.S. had been attending Immaculate High School, a parochial secondary school located in Danbury, Connecticut. Exhibit A, p. 2. See also 9/1/99 Testimony of Mary Secola ["M. Secola Test."], the relevant portions of which are appended

---

[1] The documents submitted herewith were either introduced as exhibits, filed as pleadings or issued as the decision in the underlying administrative due process hearing. Additionally, the Board has appended the relevant transcript excerpts from that proceeding.

hereto as Exhibit B, pp. 36-37. In November 1998, however, P.S. was having increasing difficulties functioning at Immaculate, the result, his doctors believed, of petit mal epilepsy. 12/2/99 Testimony of Mary Secola ["M. Secola Test."], the relevant portions of which are appended hereto as Exhibit C, p. 28. See also Exhibit B, p. 38.

    3.    On December 3, 1998, P.S.'s neurologist, Dr. Victor E. Ylagan, wrote to the Assistant Principal of Immaculate High School to recommend that P.S. receive homebound instruction. 12/3/98 Dr. Ylagan correspondence, a copy of which is appended hereto as Exhibit D. Subsequently, on December 8, 1998, P.S.'s parents enrolled him in the Brookfield Public Schools solely for the purpose of obtaining a home tutor. Exhibit A, p. 2; Exhibit C, pp. 28-29. On the December 8, 1998 Registration Form, his mother indicated that P.S. had petit mal epilepsy and needed "homebound education until his seizures are at a point where he can concentrate again in school." Exhibit A, p. 2.

    4.    On December 14, 1998, the Board assigned Beth Nanna to provide P.S. with homebound instruction. Beth Nanna Chronology, a copy of which is appended hereto as Exhibit E. See also 12/2/99 Testimony of Malinda Murchie ["Murchie Test."], the relevant portions of which are appended hereto as part of Exhibit C, p. 128. Ms. Nanna was a special education teacher at Brookfield High School. Exhibit C, p. 128.

    5.    Ms. Nanna contacted P.S.'s parents on December 14, 1998, the same day that she was assigned to be P.S.'s tutor. Exhibit E. P.S.'s parents had admitted him to Norwalk Hospital

2

earlier that day at Dr. Ylagan's recommendation for four days of video EEG tests designed to confirm whether P.S. had epilepsy. Exhibit B, pp. 38-39; Exhibit C, p. 30. Consequently, the parents informed Ms. Nanna that P.S. was then currently in Norwalk Hospital for what they thought might be epilepsy, and that they would notify her when they required her services. Exhibit D, pp. 38-39; Exhibit E.

    5.    On December 17, 1998, Norwalk Hospital ruled out epilepsy as a diagnosis and instead transported P.S. to Yale Psychiatric Hospital, where he remained until he was discharged on January 5, 1999 with a diagnosis of Schizophreniform Disorder. 12/6/99 Testimony of Joseph Secola ["J. Secola Test."], the relevant portions of which are appended hereto as Exhibit F, pp. 18-19, 48. See also 1/5/99 Yale Psychiatric Institute Discharge Summary, a copy of which is appended hereto as Exhibit G, p. 1.

    6.    During the week beginning January 4, 1999, Ms. Nanna again contacted P.S.'s parents to determine when she could commence tutoring. Exhibit E. The parents informed her that she could start as of January 10, 1999, and tutoring did, in fact, begin following P.S.'s return home. Id. See also Exhibit C, pp.31-32.

    7.    Ms. Nanna used P.S.'s textbooks from Immaculate High School during the tutoring. Exhibit C, pp. 32-33. P.S. made good progress in the tutoring and obtained good grades on his assignments. 2/10/99 Referral to Special Education, a copy of which is appended

LAW OFFICES • SULLIVAN, SCHOEN, CAMPANE & CONNON, LLC • 646 PROSPECT AVENUE • HARTFORD, CONNECTICUT 06105-4286 • (860) 233-2141
JURIS NO. 62326

hereto as Exhibit H, p. 1. In fact, P.S.'s mother believed Ms. Nanna was "very good" and "could get [P.S.] through the lesson pretty well." Exhibit C, p. 32.

8. On January 19, 1999, Immaculate High School refused to provide Ms. Nanna with Peter's midterm examinations for her to administer. Exhibit E. When Ms. Nanna notified Malinda Murchie, the Board's Director of Special Education, about this on January 20, 1999, Ms. Murchie directed Ms. Nanna to refer P.S. for evaluations to determine whether he was eligible for special education services. Id.

9. On January 27, 1999, the Board scheduled and notified the parents of a referral Planning and Placement Team ["PPT"] meeting for February 10, 1999. 1/27/99 Notice of Planning and Placement Team Meeting, a copy of which is appended hereto as Exhibit I, p. 1. On the Notice, the Board stated that the purpose of the meeting was to: "Discuss the referral for consideration of preplacement evaluations." Id. The Board included with that Notice a copy of the parents' due process rights. Exhibit C, p. 91. See also State of Connecticut Department of Education Procedural Safeguards in Special Education, a copy of which is appended hereto as Exhibit J.

10. At the February 10, 1999 PPT meeting, the Board was seeking to evaluate P.S. for the purpose of determining whether he was qualified for identification as a special education student. Exhibit C, p. 130. In conjunction with that goal, Mrs. Secola gave her consent for Peter to be evaluated in the following areas: emotional, cognitive, achievement and visual motor.

4

2/10/99 Notice and Consent to Conduct an Initial Evaluation, a copy of which is appended hereto as Exhibit K. Essentially, the PPT wanted to conduct psychiatric, psychological and academic testing. 12/6/99 Testimony of Christopher Sorenson, the relevant portions of which are appended hereto as part of Exhibit F, p. 75.

11. At its February 10, 1999 meeting, the PPT noted: "[P.S.] is making educational progress with homebound instruction and the referral process to consider SED identification will be started." 2/10/99 Written Prior Notice, a copy of which is appended hereto as Exhibit L. Thus, the PPT decided: "The educational process is working for [P.S.], so the team recommends continuing with homebound instruction while additional assessments are done." Id. The Team reached this decision based upon input from Mrs. Secola, from the Immaculate High School representatives, and from Christopher Sorenson, who worked in Danbury Hospital's Center for Child and Adolescent Treatment Services ["CCATS"]. Id. See also Exhibit F, pp. 57-58.

12. At the February 10, 1999 PPT meeting, neither P.S.'s mother nor Mr. Sorenson would provide the Board with a copy of the Yale Psychiatric Institute's Discharge Summary. Exhibit C, p. 108. See also Exhibit G, p. 1. P.S.'s mother testified that the Yale Discharge Summary was simply a medical summary and did not address P.S.'s educational needs. Exhibit C, p. 73. In the summary, however, Yale noted that P.S.'s "parents have already begun the process of setting up home-bound tutoring as the first step back to school." Exhibit G, p. 2.

5

13.     On February 11, 1999, the day after the PPT meeting, the parents revoked their consent for the Board to evaluate P.S. Exhibit C, pp. 44, 66-67. The parents decision to revoke their consent was not based upon any concerns about the credentials of the Board's evaluators. Exhibit C, p. 66. Instead, the parents refused to make P.S. available for the Board's evaluators simply because they were afraid that the evaluators would recommend a placement within the school district. Id., pp. 51-52. Furthermore, the parents revoked their consent because their attorney told them to do so. Id., pp. 44, 66-67.

14.     On February 11, 1999, the same day that the parents revoked their consent to the Board's evaluation of P.S., they informed Ms. Nanna that her tutorial services were no longer needed. Exhibit E.

15.     The parents then unilaterally placed P.S. in Danbury Hospital's ACCESS program in conjunction with the hospital's CCATS program on or about February 17, 1999. Exhibit F, pp. 46, 51. ACCESS is Danbury Hospital's education program and CCATS is its therapeutic program. Exhibit F, p. 88. P.S. was discharged from the CCATS program in April 1999. Id., pp. 46, 92.

16.     Christopher Sorenson was P.S.'s case manager during the time P.S. was attending the Danbury Hospital programs. Exhibit F, p. 61. Mr. Sorenson was not licensed or certified as a psychologist, or a social worker, or a teacher. Id., pp. 87-89. Mr. Sorenson had a B.S. in

6

Human Relations and his only certification was as a Chemical Dependency and Alcoholism counselor. Id., pp. 57, 87.

17. Mr. Sorenson was not employed in the ACCESS education program, but in the CCATS treatment program, where he worked with children who had substance abuse problems, and where the focus of his work was therapeutic, not educational. Id., pp. 88-89. At Danbury Hospital, Mr. Sorenson was not involved in making education-based decisions. Id., pp. 93-94. In fact, during the hearing, Mr. Sorenson could not say that Danbury Hospital's ACCESS program was the most appropriate educational setting for P.S. Exhibit F, p. 100.

18. Dr. John Gelinas was the Medical Director of Danbury Hospital's CCATS therapeutic program. 3/8/00 Testimony of Dr. John Gelinas ["Gelinas Test."], the relevant excerpts of which are appended hereto as Exhibit M, pp. 13-14. Dr. Gelinas did not begin to treat P.S. on a private, one-to-one basis until April 1999, after he had been discharged from the CCATS program. Id., p. 20.

19. Dr. Gelinas is not an expert in educational programs and did not provide any direct input with respect to educational placements for P.S. or for other students in the CCATS program. Exhibit M, pp. 25, 53. Dr. Gelinas never conducted any educational evaluations of P.S, did not know what methodology or instructional approach was employed with P.S. at ACCESS, never attended a PPT for P.S., and never provided the Board with an opinion regarding P.S.'s educational programming. Id., pp. 28-29, 86-88.

LAW OFFICES • SULLIVAN, SCHOEN, CAMPANE & CONNON, LLC • 646 PROSPECT AVENUE • HARTFORD, CONNECTICUT 06105-4286 • (860) 233-2141
JURIS NO. 62326

20. Dr. Gelinas's lack of involvement in P.S.'s educational programming was reflected in his testimony. Dr. Gelinas originally asserted on March 8, 2000 that it was not feasible to transition P.S. to a public school, even one that had the appropriate special education interventions. Exhibit M, p. 37. During cross-examination, however, Dr. Gelinas admitted that P.S. was enrolled full time at Immaculate High School. Id., pp. 74-76. Dr. Gelinas further acknowledged that he did not know what Immaculate's capabilities were with respect to special education interventions. Id.

21. Despite his medical issues, P.S. remained on course to graduate with his class at the conclusion of the 2000-2001 school year. Exhibit C, pp. 24-25, 49. In Spring 1999, P.S. attended classes at Danbury Hospital's ACCESS program. Id., p. 49. These courses used Immaculate's textbooks and curriculum. Id..

22. P.S. was a junior during the 1999-2000 school year, and during the Fall 1999 semester attended Immaculate High School on a part-time basis. Exhibit C, pp. 23-24; Exhibit F, p. 49. That semester, P.S. took Religion and Spanish at Immaculate, in which he received, respectively, an A and a B+. Exhibit C, p. 25. During the Fall 1999 semester, P.S. also took courses in Danbury Hospital's ACCESS program using Immaculate's textbooks and curriculum, in which classes he maintained a B average. Id., pp. 26, 49.

8

23.     At the December 6, 1999 hearing, Mr. Sorenson, P.S.'s case manager in the CCATS program, testified that he believed P.S. was "going to be able to do well in school." Exhibit F, p. 84.

24.     P.S. was a full-time student at Immaculate during the Spring 2000 semester. Exhibit C, pp. 23-24; Exhibit F, p. 49.  Immaculate High School is a traditional, mainstream school.  3/9/00 Testimony of Dr. Robert S. Colen ["Colen Test."], the relevant excerpts of which are appended hereto as Exhibit N, pp. 41-42.  When P.S. was at Immaculate during the 1999-2000 school year, he was in a regular classroom, which had approximately twenty students. Exhibit C, p. 24; Exhibit M, pp. 75-76.  Dr. Robert S. Colen, a psychologist who had been retained by the parents, testified at the March 9, 2000 hearing that P.S. was doing well in his regular classroom, mainstream setting at Immaculate.  Exhibit N, p. 42.

25.     After the parents' attorney advised the parents on February 11, 1999 to revoke their consent to allow the Board to evaluate P.S., the parents' attorney referred them to Dr. Colen, which whom he had worked in previous cases, for an evaluation.  Exhibit C, pp. 44, 66-67; Exhibit N, pp. 38-39.  The parents took P.S. to see Dr. Colen two weeks later, on February 25, 1999.  Exhibit N, p. 46.

26.     As previously noted, at the February 10, 1999 PPT meeting, the Team recommended:  "The educational process is working for [P.S.], so the team recommends continuing with homebound instruction while additional assessments are done.  The team will

LAW OFFICES • SULLIVAN, SCHOEN, CAMPANE & CONNON, LLC • 646 PROSPECT AVENUE • HARTFORD, CONNECTICUT 06105-4286 • (860) 233-2141
JURIS NO. 62326

reconvene at a later date to plan appropriate educational programming." Exhibit L. The parents or their attorney, however, nonetheless told Dr. Colen that the Board was seeking to place P.S. at its Alternative High School. Exhibit N, p. 45.

27. On February 11, 1999, the parents' attorney requested via facsimile from the State of Connecticut Department of Education a due process hearing on their behalf, setting forth the following issues:

1. Failure to timely evaluate.
2. Denial of an appropriate program.
3. Denial of an appropriate placement.

See 2/11/99 William M. Laviano correspondence, a copy of which is appended hereto as Exhibit O.

28. On March 4, 1999, the Board requested that the Hearing Officer issue an Interim Order directing Peter's parents "to make Peter available for a psycho-educational evaluation and a psychiatric evaluation conducted by evaluators of the Board's choosing and for which the Board will assume the cost." See 3/4/99 Brookfield Board of Education's Motion for Interim Order, a copy of which is appended hereto as Exhibit P, p. 1. The parents never interposed an objection to the Board's motion, and on April 21, 1999 the hearing officer granted it. 7/30/01 Final Decision and Order 99-026, a copy of which is appended hereto as Exhibit Q, p. 3, ¶8.

LAW OFFICES • SULLIVAN, SCHOEN, CAMPANE & CONNON, LLC • 646 PROSPECT AVENUE • HARTFORD, CONNECTICUT 06105-4286 • (860) 233-2141
JURIS NO. 62326

29. On September 1, 1999, the hearing was convened. Exhibit B. At that hearing, P.S.'s mother testified that she preferred not to make P.S. available for an evaluation and would only do so if she absolutely had to. Exhibit B, p. 62.

30. On or about November 30, 1999, the Board filed a Motion to Dismiss the hearing predicated upon the parents' failure and refusal to make P.S. available for evaluations. Exhibit Q, p. 4, ¶13. See also 11/30/99 Brookfield Board of Education's Motion to Dismiss Hearing, a copy of which is appended hereto as Exhibit R.

31. The hearing officer did not immediately rule on the Board's dismissal motion, and hearings were held on December 2, 3 & 6, 1999 and on March 8 and 9, 2000. Exhibit Q, p. 1. The parents used these hearings to call their witnesses; the Board did not have the opportunity to commence its case or to call any witnesses. 5/16/01 Statement of Attorney Justino Rosado, hearing officer, the relevant portions of which are appended hereto as Exhibit S, p. 38.

32. At the March 8 and 9, 2000 hearings, the hearing officer reiterated his order that the parents make P.S. available for psychiatric and psycho-educational evaluations by the Board. Exhibit M, pp. 9-10; Exhibit N, pp. 3-4; Exhibit Q, p. 3, ¶8. Nonetheless, the parents never made P.S. available for an evaluation by the Board. Exhibit Q, p. 7, ¶7. See also Exhibit N, p. 4.

33. By correspondence dated April 25, 2000, the Board requested through legal counsel that the hearing officer grant its November 30, 1999 Motion to Dismiss. See 4/25/00 M. McKeon correspondence, a copy of which is appended hereto as Exhibit T. The Board reiterated

LAW OFFICES • SULLIVAN, SCHOEN, CAMPANE & CONNON, LLC • 646 PROSPECT AVENUE • HARTFORD, CONNECTICUT 06105-4286 • (860) 233-2141
JURIS NO. 62326

its request by letters dated January 11, 2001, February 9, 2001, April 9, 2001 and April 30, 2001. Administrative Record, Exhibits AR-44; AR-46; AR-49; and AR-54.

34. On May 16, 2001, the hearing officer reconvened the hearing, at which time he heard legal argument on, *inter alia*, the Board's Motion to Dismiss. AR-54, p. 2; AR-57; Exhibit S, pp. 37-39. After hearing oral argument from the respective parties, the hearing officer ruled at the May 16 hearing that he was granting the Board's dismissal motion. Exhibit S, pp. 37-39. Subsequently, on July 30, 2001, the hearing officer issued Findings of Fact, Conclusions of Law, and a Final Decision and Order. Exhibit Q.

35. In 1997, the State of Connecticut Department of Education promulgated *Guidelines for Identifying and Educating Students With Serious Emotional Disturbance*, which provide:

> In December 1984, the Connecticut Department of Education issued a policy directive indicating that the local board of education remains responsible for a student's education when he or she is placed in a hospital due to emergency medical and/or psychiatric reasons. One *unintended* outcome of this policy has been that many students admitted to psychiatric hospitals have been automatically classified by Individualized Education Program Teams as students with serious emotional disturbance and eligible for special education by virtue of their hospitalization.
>
> Frequently, students enter a psychiatric hospital without previously having been identified as eligible for special education and related services. A referral subsequent to such a placement is made to the school district by the student's parents or by hospital personnel. The district is then obligated to consider whether an evaluation is warranted under the circumstances to determine whether the child is eligible for special education. **The rights and procedures for evaluating the educational needs of a hospitalized student suspected of being eligible for special education are the same as for a**

12

> **student referred for evaluation within the school setting. The results of evaluations conducted by a psychiatric hospital may be accepted by the Individualized Education Program Team (IEP Team); however, the IEP Team assumes the responsibility of ensuring that the evaluation meets the standards for identifying any student suspected of having a disability.**

See 1997 State Department of Education *Guidelines for Identifying and Educating Students With Serious Emotional Disturbance,* the relevant portions of which are appended hereto as Exhibit U, p. 14 (italicized emphasis added; bold print emphasis in original).

                                      THE DEFENDANT,
                                      BROOKFIELD BOARD OF EDUCATION

                                      By _____
                                      Michael P. McKeon
                                      Federal Bar No. ct02290
                                      Sullivan, Schoen, Campane & Connon, LLC
                                      646 Prospect Avenue
                                      Hartford, Connecticut 06105-4286
                                      Telephone: (860) 233-2141
                                      Facsimile: (860) 233-0516
                                      E-mail: mmckeon@sscc-law.com

13

*LAW OFFICES* • **SULLIVAN, SCHOEN, CAMPANE & CONNON, LLC** • 646 PROSPECT AVENUE • HARTFORD, CONNECTICUT 06105-4286 • (860) 233-2141
JURIS NO. 62326

## **CERTIFICATION**

This is to certify that a copy of the foregoing Defendant Brookfield Board of Education's Local Rule 56(a) Statement was sent via first-class mail, postage prepaid, on this 19th day of December 2003 to Jennifer D. Laviano, Esq., 77 Danbury Road, Suite C-6, Ridgefield, Connecticut 06877.

_____
Michael P. McKeon

LAW OFFICES • SULLIVAN, SCHOEN, CAMPANE & CONNON, LLC • 646 PROSPECT AVENUE • HARTFORD, CONNECTICUT 06105-4286 • (860) 233-2141
JURIS NO. 62326