## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **P.S., A MINOR, BY HIS PARENT, J.S.** | : | **CIVIL ACTION NO.** |
| **Plaintiff,** | : | **3:01CV1757 (GLG)** |
| | : | |
| **v.** | : | |
| | : | |
| **THE BROOKFIELD BOARD OF** | : | |
| **EDUCATION** | : | |
| **Defendant.** | : | **April 7, 2004** |
| | : | |

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### I.    Introduction

The Defendant, Brookfield Board of Education, has filed a Motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure[1], claiming that they are entitled to Judgment as a matter of law.  In so doing, the Defendant has misconstrued the legal obligations of the school district with regard to the evaluation and identification of students with disabilities.  In essence, it is the Defendant's position that the Plaintiff, P.S.,[2] was not entitled to identification under the IDEA, and therefore not entitled to special education and related services, because the Defendant is allegedly "required" to conduct its own evaluation of a student prior to identifying that student as eligible.  Moreover, the Defendant claims that the underlying administrative Hearing was

---

[1] There is no dispute with the Defendant's statement of the legal standard for issuance of a Summary Judgment Motion pursuant to Rule 56.

[2] As the Plaintiff, P.S., is currently over the age of eighteen, all rights under the IDEA have been legally transferred to him.  However, for purposes of this Motion, "Plaintiffs" will include both P.S. and his parents who brought the underlying administrative Hearing on his behalf.

properly dismissed based upon the Plaintiffs supposed refusal to permit evaluation of P.S. Finally, the Defendant claims that the Plaintiffs have forfeited their right to reimbursement of the unilateral placement at the ACCESS School based upon this claimed refusal to permit evaluation by the Board. As will be demonstrated herein, the Board's statement of the IDEA and its implementing regulations as it is applied to this case is inaccurate. However, in the event that the Court finds that the Defendant has properly stated the legal requirements of the school district as to evaluation and identification, there exist material issues of fact which are in dispute.

II.     Opposition To The Defendant's Motion for Summary Judgment

    A.    The Defendant was not and is not *required* to conduct its own evaluation of a student before identifying a student as eligible for special education and related services.

The Defendant has stated in its Motion for Summary Judgment that it was required and mandated to conduct its own evaluations of the Plaintiff before determining that he was entitled to identification and services under the IDEA. Specifically, the Defendant states that "the Board could not determine P.S.'s eligibility for special education until it evaluated him…" (Defendant's Memorandum of Law at page 17)  In support of this proposition, the Defendant cites 20 U.S.C. §1414(a)(1)(A) as well as 34 C.F.R. §300.531. In addition, the Defendant cites Connecticut Agency Regulations §10-76d-9. Each of these statutes state that a child "shall be evaluated" before being identified for special education and related services; however, they do not require that the child "shall be evaluated" by the school district. In fact, the evaluation procedures which

2

should be conducted in the identification of a child under the IDEA are clearly controlled and modified by 20 U.S.C. §1414 (c) (1), which states in pertinent part as follows:

> (c) **Additional Requirements for Evaluation and Reevaluations**.
> (1) **Review of existing evaluation data**. As part of an *initial* evaluation (if appropriate) and as part of any reevaluation under this Section, the IEP team…as appropriate, shall-
> (A) Review existing evaluation data on the child, *including evaluations and information provided by the parents of the child*…and
> (B) On the basis of that review, and input from the child's parents, identify *what additional data, if any*, are needed to determine-
> (i) Whether the child has a particular category of disability…
> (iii) Whether the child needs special education and related services.
> (20 U.S.C. §1414 (c)(1), emphasis supplied)

Moreover, the implementing regulations also provide for the discretion of the IEP team in identifying a child based upon outside testing, without the necessity of conducting its own evaluation. 34 C.F.R. §300.533 states that the IEP team must consider information provided by the parents of a child in considering whether that child should be identified as disabled under the act, and states that "on the basis of that review, and input from the child's parents, identify what additional data, *if any*, are needed to determine…whether the child has a particular category of disability." (34 C.F.R. §300.533 (a)(2), emphasis supplied)

Accordingly, the Defendant is not accurate that the Board was "mandated" to conduct its own evaluation prior to identifying the Plaintiff as eligible for services under the IDEA, but rather whether or not to conduct further testing was and is discretionary. This is important not only because it is clear from the facts in this situation that the

3

information which was provided by the parents was more than sufficient to justify identification of the Plaintiff under the IDEA, but because this misstatement of the requirements of the Act was made directly to the parents by the administrator of the PPT, Ms. Murchie, at the PPT of February 10, 1999. As P.S.'s mother testified in the underlying Due Process Hearing:

> I let them know I wanted him to go to ACCESS. And Mrs. Murchie then told me, "let me educate you, as to this process. We cannot put him anywhere, until he takes a series of tests. We cannot place him, until we know – have all these tests done and evaluate and reconvene, and then we can decide if he can have the Special Education and all." (Testimony of Mrs. S., September 1, 1999 at pp. 50-51, attached hereto as Exhibit 1)

Mrs. S. proceeded to testify that, having been given this inaccurate information by the Defendant, and feeling intimidated by the process, she signed consent for the Board to evaluate P.S. After consulting with her husband, P.S.'s doctors, and her counsel, she revoked consent the next day.

Indeed, given the fact that the nature of the evaluations proposed by the Board at that PPT[3] were neither comprehensive nor necessary in order to find P.S. eligible for services, and in fact could well have been harmful to him, there is no basis in either fact or law for strictly complying with this provision as a tool to deny services.

In a recent decision issued in the United States District Court for the District of South Carolina, <u>Tracy v. Beaufort County Board of Education</u>, C.A. No. 9:03-849-23 (March 5, 2004, copy attached hereto as Exhibit 2), the authority of a PPT to identify a student under the IDEA absent its own evaluations was outlined. In that case, the parents had obtained their own evaluation of their child, which they shared with the PPT Team.

---

[3] This will be discussed in greater detail below.

4

In reversing the administrative Hearing Officer's determination that this was a violation

of the IDEA, the Court stated as follows:

> The LHO[4] also stated that the District acted improperly by relying upon the
> MUSC evaluation rather than conducting its own evaluation. The LHO cited no
> statutory or regulatory support for this proposition, and this Court is aware of
> none. The IDEA mandates that independent evaluations procured by parents be
> given full consideration in the IEP process; it does not require that the District
> conduct its own evaluations where there is no indication that there is a need for
> additional testing. Tracy v. Beaufort County Board of Education at Footnote 6.

Such is the case here. In this matter, the Plaintiffs had received a diagnosis from Yale

Psychiatric Institute, where the Plaintiff had been hospitalized, indicating that the

Plaintiff had been diagnosed with schizophreniform disorder. He had been hospitalized as

a result of having a psychotic "break" from reality, including auditory and visual

hallucinations. In response to this information, the IEP team requested testing, not by a

psychiatrist[5], but rather educational testing by a school psychologist.[6] Indeed, Exhibit K

attached to the Defendant's Rule 56(a) Statement clearly outlines that the Board was

requesting that all evaluations be conducted by "L. Pernice", the District's school

psychologist. Those tests were largely IQ and achievement testing, which would rule out

learning disabilities, not psychiatric assessment to ascertain whether P.S. indeed had a

psychiatric disorder which would make him eligible for special education services as

Emotionally Disabled. Indeed, a school psychologist is neither licensed nor credentialed

to issue psychiatric diagnoses, and even if the parents had not revoked consent for the

evaluations requested by the Board on February 10, 1999, there is no information which

---

[4] South Carolina's equivalent of an administrative Hearing Officer under the IDEA.
[5] As will be demonstrated below, the request for psychiatric testing came much later.
[6] It is important to note that a school psychologist is not equivalent in background or certification even to a clinical psychologist, let alone psychiatrists in a prestigious psychiatric hospital.

could have possibly been gleaned from these tests which could have supported or refuted a psychiatric diagnosis by the medical professionals at Yale Psychiatric Institute.

The IDEA requires, as conceded by the Defendant, that a school district, *when it chooses to* conduct an evaluation of child in order to determine eligibility, do so in a thorough, comprehensive, and reliable manner. These requirements include requirements that assessments be administered by trained and knowledgeable personnel, that parents be fully informed as to the procedures and purpose of the evaluations, and that the child "is assessed in all areas of suspected disability." 20 USC 1414(b)  In this case, the Defendant's proposed evaluation at the February 10, 1999 PPT fails to meet the procedural requirements of the Act.

It was not until the March 4, 1999 Motion by counsel for the Defendant (Exhibit P of Defendant's Rule 56(a) Statement) that the Board ever requested a *psychiatric* evaluation of P.S. This was, of course, AFTER the Plaintiffs had both unilaterally placed P.S. at ACCESS and had demanded a Due Process Hearing. P.S. had suffered a severe, adolescent onset of psychosis, which is clearly a psychiatric disorder. It almost goes without saying that the natural manner in which a PPT would assess this "suspected disability", if it chose to question the diagnosis issued by Yale Psychiatric Institute,, would be to bring in a psychiatrist with expertise in assessing this disorder in students P.S.'s age, or, at the very least, a clinical psychologist with similar experience. This was not done. In summary, the Defendant misinformed the Plaintiffs of their Due Process rights at the February 10, 1999 PPT, mislead them into believing that P.S. could not be identified or receive services unless the Board conducted its own testing of P.S., and proposed an evaluation of him which was incomplete and would not, as required by law,

6

assess his suspected areas of disability. When the Parents exercised their right to challenge the proposed evaluation as inappropriate and insufficient by bringing a Due Process Hearing on this issue, the Board's response was to belatedly propose psychiatric assessment of the Plaintiff nearly one month after the PPT at which the original inappropriate evaluation had been designed by the Defendant, and almost three months after the Parents had originally contacted the Defendant regarding P.S.'s behaviors and need for special instruction.[7] At that point, the Parents had been misled as to their rights by the Board, told that P.S. could not be identified or receive appropriate services until testing was done by the school psychologist, and had been urged to place their highly fragile child in an "alternative" program within the District for troubled teenagers. In the absence of appropriate evaluation or programming the Plaintiffs obtained their own by hiring a qualified evaluator, Dr. Colen, and placing P.S. at the ACCESS School.

Even assuming, *arguendo*, that the Defendant is correct, and that they do have the obligation to personally evaluate the Plaintiff before identifying him for services, there remains a very real factual question as to whether or not the proposed evaluation of February 10, 1999 met the procedural and substantive requirements of the Act. The Plaintiffs propose that the individual who was to undertake the evaluation of P.S. by the Board, Ms. Lois Pernice, was not a properly qualified professional to assess P.S.'s suspected areas of disability. Moreover, the Plaintiffs maintain that the specific assessments outlined in the consent form do not meet the requirements of 20 USC 1414(b), and also would not appropriately assess P.S.'s suspected areas of disability.

---

[7] As will be discussed below, it is also extremely important to note that between early December, 1998 and February, 1999, the Defendant did not make one request to evaluate P.S., despite being informed of his behaviors and the parents' concerns. This, too, is a failure under the IDEA to properly evaluate the Plaintiff.

Finally, the Plaintiffs maintain that they were not properly and fully informed of the assessment procedures or purposes in the proposed evaluation. These are all disputed, genuine issues of material fact which, assuming the facts in the light most favorable to the Plaintiffs, preclude the issuance of Summary Judgment in the Defendant's favor.

        B.     The Defendant's right to select their own evaluators is not absolute under the IDEA.

The Defendants claim that, even if they were not required to evaluate the Plaintiff themselves, they are entitled to do so, with individuals of their own choosing, prior to providing special education programming. The Defendant cites for the proposition that the "Second Circuit has repeatedly held that a school district is entitled to evaluate a child by evaluators of its own choosing" Dubois v. Conn. State Bd. of Educ., 727 F.2d 44 (2nd Cir. 1984), a case decided over a decade before the 1997 reauthorization of the IDEA. While it is true that deference is typically given to school districts in the development of an evaluation of a child, it is equally true that the IDEA specifies how the evaluation is to be conducted, by whom, and with parental consent. 20 U.S.C. 1414(b)  Absent parental consent as required by 20 U.S.C. 1414(c)(3), both parents and boards of education are entitled to review from an impartial hearing officer through a Due Process Hearing as to whether those evaluations comply with all state and federal requirements as to evaluations. In fact, in Connecticut a school district may move to compel such an evaluation pursuant to C.G.S. 10-76h(d)(1).

Therefore, both parents and boards of educations are entitled to a review, through a thorough, impartial Due Process Hearing, of the appropriateness of the proposed evaluation, and to be ensured that the proposed evaluation complies with federal and state

requirements. Here, the parents did not consent to the proposed evaluation, and exercised their right to have a Hearing Officer determine whether or not said evaluation was appropriate. The Defendant submitted a Motion for Interim Order to compel what was then transformed into both psychological *and* psychiatric evaluation on March 4, 1999. (Defendant's Rule 56(a) Statement, Exhibit P)  The Hearing Officer granted this Motion on April 21, 1999 (A.R. 14), nearly FIVE MONTHS before the first day of testimony began on September 1, 1999.  This is clearly reversible error.

A parents' right to challenge the proposed evaluation of their child through an impartial Due Process Hearing which complies with the requirements 20 U.S.C. 1415 can not reasonably be accomplished when a Hearing Officer "rubber stamps" the Board's requested evaluation prior to one scintilla of documentary or testimonial evidence having been presented.  How a Hearing Officer could determine that the proposed evaluations of February 10, 1999 and March 4, 1999 complied with the procedural requirements of the Act without beginning the evidentiary portion of the Hearing is a mystery, but the extensive and numerous parental rights to an administrative review of a proposed evaluation under the IDEA were clearly not followed in this case.  To hold otherwise would be to reduce the parents' right to challenge the appropriateness of a proposed evaluation to nothing, and boards of education could simply discharge their duty to comply with the evaluation requirements under the Act by sending a Motion to a Hearing Officer which states, in essence, "we want these tests because we want them and we are entitled to have them."  Perhaps a Hearing Officer could agree with a board AFTER hearing testimony as to what specifically was proposed, what suspected areas of

9

disability the testing would assess, and the qualifications of the individuals proposed to undertake them, but certainly not before!

The necessity of following the procedural requirements of the IDEA with regard to appropriate evaluation can not be better demonstrated than in the instant case. Here, we have a student who began exhibiting strange behaviors in the Fall of 1998. The initial conclusions of the medical professionals was that the Plaintiff was experiencing petit mal seizures, and the parents contacted their school district upon receipt of this information in December of 1998 to enroll him in the public schools and obtain homebound instruction for him.[8] The Plaintiff quickly and severely deteriorated, going from a healthy, excellent student at a competitive private school[9] to a young man who was literally hearing voices and experiencing hallucinations in the period of a few months. The result of this was an extensive period of psychiatric hospitalization and a diagnosis by Yale Psychiatric Institute of adolescent onset schizophrenia. After taking their child to numerous professionals, and enduring what indeed must be any parent's worst nightmare, the Plaintiffs again sought the assistance of their school district upon the advice of P.S.'s

---

[8] A service which can hardly be characterized as anything but special education instruction, and which the Defendant provided WITHOUT undertaking or requesting any evaluation of the Plaintiff based solely upon a *two-sentence recommendation* from P.S.'s neurologist. (Exhibit D to Defendant's Local Rule 56(a) Statement)

[9] Numerous references have been made by the Defendant both in the underlying Due Process Hearing and before the Court to the fact that the Plaintiff had been privately educated in a parochial school prior to the 1998-1999 school year, in an attempt to suggest that the Defendant should somehow be excused for their failure to act properly and swiftly having just been informed of the Plaintiff's existence in December of 1998. Not only does this fact ignore the Board's obligations to a disabled student under state and federal law, but the innuendo is unnecessary and offensive. The Plaintiffs chose to privately educate P.S. for his entire educational career until his psychotic break, never once requesting that the District support any portion of his private placements, and continuing to assume the tax liabilities of residence in Brookfield without availing themselves of any of the public educational services for which they were paying. This is not, as has been suggested, a family who is simply attempting to have their child privately educated at public expense because of an aversion to public education, but, rather, is a family who followed proper legal channels once it became evident that their child suffered from a severe, debilitating mental disability.

medical professionals. (Testimony of Mrs. S., September 1, 1999, pg. 46, attached hereto as Exhibit 3)

The Plaintiffs requested a PPT to share with the Defendant the diagnosis by Yale, request that P.S. be identified as eligible for special education instruction, and receive appropriate educational services at a therapeutic day treatment center which operated in conjunction with the hospital placement and personnel at Danbury Hospital where the Plaintiff was receiving treatment. While the Defendant has claimed that the Plaintiffs did not actually share with the PPT the discharge summary from Yale Psychiatric Institute, this is absolutely disputed by the Plaintiffs. The Defendant's response to the Plaintiffs at the February 10, 1999 PPT boils down to "we want our school psychologist to evaluate your child, because we do not accept the diagnosis of the medical doctors of schizophreniform disorder from the Yale Psychiatric Institute."

The Plaintiffs presented testimony in the underlying Due Process Hearing that there was a serious risk of *permanent* injury to the Plaintiff if he had been subjected to inappropriate evaluation by an individual not qualified to assess him. Moreover, the expert testimony presented by the Parents indicated that virtually any delay in programming for him could result in a second psychotic break, the result of which could seriously hinder long-term prognosis for him. (See, e.g., testimony of Dr. Gelinas, March 8, 2000, pp. 46-49, attached hereto as Exhibit 4)

The Defendant has cited a Fifth Circuit Decision, Andress v. Cleveland Independent School District, 64 F. 3d 176 (5th Cir. 1995) which reversed a District Court ruling which found that a school district may not choose their own personnel if this

11

would "harm the child medically and psychologically." However, there does not appear to be a similar case on point in the Second Circuit.[10]

The IDEA is replete with references to protecting the best interests of the child. The purposes of the Act are clearly defined, and include the goal to ensure "equality of opportunity, full participation, independent living, and economic self sufficiency for individuals with disabilities." 20 U.S.C. 1400 (c) The Act's goal of ensuring that individuals with disabilities lead independent lives can hardly be met if a school district can assert an unfettered right to evaluate a student which may lead to long term dependence and institutionalization because of the inappropriateness of that evaluation and the inexperience of the individuals proposed to undertake the testing. Another purpose of the Act is to "ensure that the rights of children with disabilities and parents of such children are protected." 20 U.S.C. 1400 (d)  Again, to require a child to undergo harmful, incomplete, and unnecessary evaluation by a school district is in stark contrast to the purposes of the Act.

Indeed, there are specific exceptions to several of the obligations which parents have under the Act where, as here, to comply with those provisions would cause harm to the student.  The best example of this is found in 20 U.S.C. 1412(A)(10)(B)(iv)(II), wherein a parent need not comply with the notice provisions of a unilateral placement if compliance "would likely result in physical or serious emotional harm to the child."

However, assuming that the Defendant's interpretation of the law is correct, and that the Board has a virtually unfettered right to evaluate a student with its choice of

---

[10] The Defendant also directs the Court to Schwartz v. The Learning Center, a case which is completely irrelevant, as it deals almost exclusively with Section 504 of the Rehabilitation Act, not the IDEA which is a much more comprehensive Act and offers far more protection to parents and children. Moreover, a review of Schwartz makes it clear that there was no evidence in that case that the student would actually be harmed by evaluation, other than the parents' personal opinion.

evaluators, there remain genuine issues of material fact in dispute. The Plaintiffs dispute that the individual selected by the Defendant are properly credentialed and trained to have assessed P.S., and that the assessments selected comply with the Act. There has been NO evidence to refute this claim in the underlying Hearing. The Plaintiffs maintain that to have delayed in evaluating P.S. and to have subjected him to the assessments proposed by the Board would have caused the Plaintiff serious emotional harm, and the Defendants dispute this. Finally, in order to ascertain whether the Defendant required additional testing, or if the information provided to the February 10, 1999 was sufficient to identify P.S. without warranting additional data, there is a factual dispute as to whether that information was provided to the PPT by the Plaintiffs. These material factual disputes also, when viewed in the light most favorable to the Plaintiffs, compel denial of Summary Judgment.

C.    The 1997 *Guidelines for Identifying and Educating Students with Serious Emotional Disturbance* developed by the State Department of Education does not alter the legal requirements of the Defendant

In the underlying Hearing, the Plaintiffs proffered a 1984 policy directive from the Connecticut State Department of Education (attached hereto as Exhibit 5) which clearly outlined a school district's obligation to identify a student for special education services "when one of their students is placed in one of the following facilities: Hall-Brooke Hospital, Westport; Elmcrest Psychiatric Institute, Portland; The Institute of Living, Hartford; **the Yale Psychiatric Institute** (Cedarhurst), New Haven; Newington Children's Hospital, Newington; the Center of Progressive Education (COPE), New Haven...or Children and Adolescent's Psychiatric Service, Mt. Sinai Hospital

13

(Woodstock School)." (emphasis supplied)  The circumstances described in the directive could not be more analogous to the instant matter.  The directive states:

> At certain points in their lives, the medical or psychiatric needs of children may be so severe or pressing that they override concerns about special education.  In many cases children may require the immediate provision of twenty-four hour medical and/or psychiatric care as determined by a licensed physician.  Instances of the latter could involve self-destructive acts, prepsychotic and psychotic states, and other medical/health related emergencies.

The directive goes on to instruct local school districts that "(a)ny student admitted to these facilities for medical and/or psychiatric reasons should be classified by a local board of education as a student requiring special education".  In addition, local educational agencies were directed to "initiate a joint PPT meeting with representation from the medical/psychiatric facility no later than two weeks from the date of notification of admission by the institution and prior to the implementation of education services."[11]

The Defendant claims that the State Department of Education "expressly repudiated" this policy directive in the 1997 *Guidelines*.  (Defendant's Memorandum of Law in Support of Motion for Summary Judgment, pg. 25)  However, a careful review of the language cited by the Defendant in the 1997 Guidelines make it clear that, in fact, the guidelines are *additional* evidence of the fact that the Defendant was not "required" or mandated to conduct its own evaluation as has been claimed.  Embedded in the very excerpt of the guidelines cited by the Defendant is the support for this:

> Frequently, students enter a psychiatric hospital without previously having been identified as eligible for special education and related services.  A referral subsequent to such a placement is made to the school district by the student's parents or hospital personnel.  The district is then obligated to consider *whether an evaluation is warranted* under the circumstances to determine whether the

---

[11] It is important to note that the Plaintiffs' testimony was that they made the Defendant aware of P.S.'s hospitalization at Yale Psychiatric Institute during the week of December 21, 1998, and again the week of January 4, 1999.  The PPT was not called by the district until February 10, 1999.

child is eligible for special education...The results of evaluations conducted by a psychiatric hospital *may be accepted* by the Individualized Education Program Team (IEP Team); however, the IEP Team assumes the responsibility of ensuring that the evaluation meets the standards for identifying any student suspected of having a disability. *Guidelines for Identifying and Educating Students with Serious Emotional Disturbance*, pg. 14, Exhibit U to Defendant's Rule 56(a) Statement, emphasis supplied.

Again, this situation is precisely that of the Plaintiff. P.S. entered a psychiatric hospital without having been identified previously as a special education student. A referral was made to the PPT by his parents at the suggestion of hospital personnel.[12]

However, when the PPT convened, and evaluation results from Yale Psychiatric hospital were shared, the Defendant failed to consider it at all, let alone determine whether the evaluation "meets the standards for identifying any student suspected of having a disability". The Defendant has maintained in its papers that the Board was not given a copy of the YPI discharge summary to consider at the PPT. (Defendant's Memorandum of Law in Support of Summary Judgment Motion at pg. 7) This claim is based upon the assertion by the Board's administrator, Ms. Murchie, that the parent and Mr. Sorenson from CCATS "refused" to provide the Board with a copy. However, the testimony by Ms. Murchie is belied by the testimony of the parent who attended the PPT AND Mr. Sorenson, who testified that at the PPT of February 10, 1999 the Yale discharge summary was provided to the Board by P.S.'s mother:

> I had a copy of the evaluation and I made it very clear in the meeting that Federal law prohibited me from giving that copy from Yale Psychiatric Institute, to the High School. That would be breaking confidentiality law. Mrs. S. also had a copy of that and gave it to the Administrator, or, I don't remember which one, but gave it to one of the administrators at the meeting, and they proceeded to make a copy of that document. (Testimony of Mr. Sorenson, December 6, 1999, pg. 75, attached hereto as Exhibit 6)

---

[12] At this point, the hospital personnel involved were at Danbury Hospital's Center for Child and Adolescent Treatment Services (CCATS) therapeutic program, where the Plaintiff had been transferred from YPI.

Finally, the discharge summary itself, Exhibit G attached to the Defendant's Rule 56(a)

Statement, states that it was provided to the Board on February 10, 1999. Insofar as there

is a factual dispute as to whether this document was provided at the February 10, 1999

PPT for the school to consider in determining, as required by law, a) whether additional

data was warranted, and b) if the evaluation met the legal requirements for identifying a

student with a disability, this dispute would also require a denial of the Defendant's

Motion for Summary Judgment. The primary issue in the Complaint is the appeal of the

underlying Hearing Officer's Decision, which dismissed, in part, the Plaintiff's failure to

properly and timely evaluate claim. In order to determine whether the Defendant failed

to meet its obligations under 20 U.S.C. 1414(b), it is essential to determine whether, in

fact, they reviewed the YPI discharge summary or not. If they were provided a copy and

did not consider it in considering eligibility, they are in clear violation of 20 U.S.C.

1414(c)(1)(A), as well as 20 U.S.C. 1414(c)(1)(B). Viewing the alleged facts in the most

favorable manner to the Plaintiffs, a legitimate issues exists as to whether or not the

Defendants failed to properly and timely evaluate the Plaintiff.

D.    The Plaintiffs should not be denied reimbursement for their unilateral placement under the IDEA based upon either a refusal to permit evaluations or a finding of unreasonableness.

The Defendant cites 20 U.S.C. 1412(A)(10)(B)(iii)(II-III) to urge the Court to

issue Summary Judgment due to the Plaintiff's alleged refusal to permit evaluation, and

based upon a finding of unreasonableness on the parents' part. Both of these claims must

fail.

16

First, the Defendant cites the discretion of a hearing officer to reduce or deny the reimbursement to parents for the costs associated with a unilateral placement "if, prior to the parents' removal of the child from the public school, the public agency informed the parents, through the notice requirements described in section 1415(b)(7), of its intent to evaluate the child (including a statement of the purpose of the evaluation that was appropriate and reasonable), but the parents did not make the child available for such evaluation..." 20 U.S.C. 1412(A)(10)(B)(iii)(II).  In this case, P.S. was not a student in the public school to begin with, but was receiving homebound tutoring, and therefore could not be "removed" from the public schools.  However, even assuming that the effect of receiving homebound services from the public schools is the same as being placed in the public schools for purposes of removal, it is clear that, in order for this provision to be triggered, the board must comply with the notice requirements of their intent to evaluate AND that the parents are informed of the purpose of the evaluation "that was appropriate and reasonable."  Viewing the facts in the light most favorable to the Plaintiffs, this limitation on reimbursement can not be applied to the Plaintiffs.  While the "notice requirements" of 20 U.S.C. 1415(b)(7) appear to have been met in this case, the Plaintiffs did not receive an "appropriate and reasonable" statement from the Defendant of the purpose of the evaluation.  In fact, the only "purpose" which was given to them at all was an inaccurate representation of the legal requirements of the school district.  The reason the parent was told at the February 10, 1999 PPT that the school wanted to assess P.S. in the areas for which they requested consent was because they were "required to" in order to give the Plaintiff special education services.  This stated purpose is not only a misconstruction of the Board's legal requirements, but can not possibly meet the

17

standards of appropriateness and reasonableness outlined by the IDEA. As was noted above, this is especially the case given P.S.'s complex and difficult mental status and diagnosis.

The Defendant also cites 20 U.S.C. 1412(A)(10)(B)(iii)(III) as another basis upon which reimbursement should be limited in this matter. This provision provides that a parents' unilateral placement costs may be reduced or denied "upon a judicial finding of unreasonableness with respect to actions taken by the parents."

At the outset, it is important to note that this is only ONLY reimbursement limitation section which requires a "judicial finding", rather than merely a determination by a Hearing Officer. Accordingly, as the allegations which the Defendant cites as a basis for this finding are absolutely disputed by the Plaintiffs, we have yet another instance of a disputed, material, and genuine fact.

The parents first contacted P.S.'s school district in early December of 1998. At that time, the Plaintiff was exhibiting behaviors which later turned out to be early signs of his later-diagnosed schizophreniform disorder. When the parents contacted the school district, there was no PPT scheduled, and no request *at that time* for evaluations to determine whether P.S. might require services, and yet the Defendant proceeded to provide the Plaintiff with home-bound, one-to-one instruction.[13] They did so upon the *extremely brief* recommendation of Dr. Ylagan (Exhibit D attached to Defendant's 56(a) Statement), a document which is far less comprehensive than the Yale Psychiatric Institute's discharge summary which was later deemed insufficient evidence to justify the

---

[13] It is reasonable to wonder whether, had the Defendant taken its evaluation requirements as seriously in December 1998 as they did after being asked to fund an out-of-district placement in February 1999, a referral by the PPT to a psychiatrist might have earlier revealed the schizophreniform disorder, rather than after P.S.'s psychotic break.

18

provision of services. The Plaintiffs were in regular contact with the school's representative who had been assigned to provide tutoring to P.S., and contacted her when the Plaintiff's condition worsened and he was hospitalized. Upon learning of P.S.'s diagnosis at Yale, the parents again contacted the board, and informed them of the diagnosis, P.S.'s psychiatric hospitalization, and the uncertainty of discharge timing and prognosis. After P.S.'s discharge from Yale and transfer back to Danbury Hospital, the parents were again in touch with the board regarding P.S.'s status. (Testimony of Mr. S., December 6, 1999, pp. 23-24, attached hereto as Exhibit 7)  From December of 1998 through late January of 1999, despite having been informed of at least two serious medical conditions and extended hospitalizations of the Plaintiff, the Defendant did not ONCE request a PPT to discuss P.S. It was not until the individuals at Danbury Hospital suggested that the parents specifically request a PPT, which they did, that a formal meeting was ever scheduled. (Testimony of Mrs. S., September 1, 1999, pp. 41-42, attached hereto as Exhibit 3)

When the meeting finally did convene on February 10, 1999, the parent was faced with a series of shocking responses. First, she is told that, despite the fact that the Defendant had agreed to provide special services to P.S. back in December without the need of a PPT, evaluation, or identification, and now that the parent was seeking out of district placement at ACCESS, that the board "must" evaluate P.S. themselves. She is given a form to sign "or else" her child would receive no services. Next, the staff extols the virtues of the board's "alternative" high school[14], which she is aware includes a peer group of acting out, disenfranchised students. Both Mrs. S. and Mr. Sorenson from CCATS express their concerns and disagreements about the appropriateness of this

[14] Alternately referred to in the Record as "the firehouse" and the "Center School."

19

placement for P.S., given his extremely fragile state. They are told, in essence, that nothing can be done until P.S. is evaluated by the school psychologist, after which time a PPT would be reconvened, and in the interim the Plaintiff could continue to stay at home receiving tutoring services or attend the alternative high school. (Testimony of Mrs. S., September 1, 1999, pp. 50-51, attached hereto as Exhibit 1; Testimony of Mr. Sorenson, December 6, 1999, pp. 71-72, attached hereto as Exhibit 8) Neither of these options were safe, appropriate, or viable for P.S., who required a stable transition into an educational environment, and, after consulting with various professionals, the parents made a unilateral placement at the ACCESS School.

The fact that the Plaintiffs revoked consent for the inappropriate evaluations after consulting with P.S.'s doctors and counsel does not transform the Plaintiffs into unreasonable, uncooperative individuals as characterized by the Defendant. They had been told that their child was *required* to undergo testing by the school district, which was untrue. The evaluation which was proposed by the board did not include any individuals with the expertise to evaluate, diagnose, or assess schizophreniform disorder. The PPT was "pushing" a highly inappropriate placement at an alternative program for behaviorally challenged and drug-involved students. The school district was ignoring the official diagnosis of the doctors at Yale Psychiatric Institute and CCATS that P.S. was suffering from psychosis, and were insisting that their school psychologist assess him. Finally, P.S.'s doctors were informing his parents that he could not tolerate the stress of testing by an individual who was not trained to recognize the subtle stress signs of his disorder during the assessment, and that a second psychotic break would dramatically reduce the likelihood of healthy prognosis *for the rest of his life*. (Testimony of Mr. S.,

20

December 6, 1999, pp. 36-37, attached hereto as Exhibit 9)  What parent would behave differently if their child was in a medical, emotional, psychiatric crisis?  The Defendant may have a legal basis for claiming that the parents' revocation of consent has some impact on the school district's obligation to identify P.S., but to characterize the parents' actions as "unreasonable" is absurd!

As further support for the claim that the Plaintiffs have acted unreasonably, the Defendant points to the Plaintiff's failure to make P.S. available to the Board for testing after having been ordered to do so by the Hearing Officer.  The Interim Order was based entirely upon statements made by Board counsel in the Motion, without any testimony, affidavits, or evidence having been produced before the Hearing Officer.  As a practical matter, the Hearing Officer, in issuing an Order that the parents comply with the newly proposed evaluations by the Board, ruled on the parents' issue of failure to properly evaluate in accordance with the IDEA without hearing any evidence.

As a last effort to claim that the Plaintiffs have acted unreasonably in this matter, the Defendant attempts to misrepresent the reason that the parents did not agree with the Board's proposed evaluation, and to further attempt to disparage the credentials of the individual that was privately retained to assess P.S.  It appears that the Defendant believes that the parents did not agree with the proposed evaluation by the Board "because they were afraid they would not like the results of the evaluation" often enough, it will become true.  However, a review of the record and testimony in the underlying Hearing makes it clear that this was <u>not</u> the reason the parents refused consent.  Those reasons have been outlined in detail above, and the specific citation to the record included in the Defendant's Motion for Summary Judgment, which is the testimony of Mrs. S. on

21

September 1, 1999 at pg. 51 (Exhibit 1 attached hereto), is in response to questions regarding why the parents obtained a private evaluation from Dr. Colen, not as to why the parents did or did not agree to the proposed evaluations by the Board.

As to the claims by the Defendant that the Parents' concerns regarding P.S.'s ability to be assessed being somehow undermined by the fact that Dr. Colen was permitted by the parents to assess him soon after they revoked consent with the Board, the Court is urged to review the credentials of Dr. Colen in the record. The caution which was expressed to the Plaintiffs about evaluating P.S. was that whomever conducted the evaluation have significant experience in assessing individuals with schizophrenia or schizophreniform disorder so as to be able to know how to avoid over-taxing P.S. to a second "breaking point." (Testimony of Mr. S., December 6, 1999, pp. 36-37, attached hereto as Exhibit 9) Dr. Colen not only had the credentials of being a licensed clinical psychologist working with children and adolescents with a variety of severe emotional issues, but was on the staff of The Boy's Center in Stamford, working mostly with the schizophrenic population. (Testimony of Dr. Colen, March 9, 2000, pp. 9-12, attached hereto as Exhibit 10)

The Defendant is asking this Court to issue Summary Judgment, in part, upon a *judicial finding* of unreasonableness which would deny or limit reimbursement of the unilateral placement of the Plaintiff at ACCESS. In order to assess whether the Plaintiffs acted unreasonably in this matter, a fact-finder must determine whether the version of events as the Plaintiffs have described them are credible or not. This can not be done if Summary Judgment is ordered.

22

III.    Conclusion

In the instant matter, the Defendant has violated state and federal special education obligations, practices, and procedures for the identification, evaluation, and provision of services to the Plaintiff. They did nothing to suggest any testing for this student upon learning of his original diagnosis, did not convene a PPT, did not identify him, and yet provided him with special homebound services. It was not until the student required a costly, out-of-district placement, and the Plaintiffs pressed for a PPT, that the Defendant suddenly decided it "required" its own evaluation of the Plaintiff. What was proposed at that time was an evaluation that was incomplete, insufficient, and unable to assess the suspected disability which would entitle P.S. to special education identification and services. Further, they misstated the purpose for which testing was proposed as being a necessary prerequisite to identification under the IDEA. Once the parents realized this, and exercised their right to have a Hearing Officer review whether or not the evaluations were appropriate and timely, the Defendant belatedly proposed an evaluation procedure that more closely approximated an appropriate assessment by at suggesting psychiatric assessment. However, this was months after the parents had first notified the district of P.S.'s issues, an well after the Plaintiffs had been forced to retain counsel, bring a Due Process Hearing, retain an appropriate evaluator, and unilaterally place P.S. at an appropriate educational facility. The Defendant wishes to profit from its own malfeasance by taking the position that a school district can propose an inappropriate evaluation, misrepresent the law to parents, fail to consider the unassailable diagnosis provided by the parents from a prestigious psychiatric facility, fail to identify a child who clearly meets the standards as disabled, and then be completely obviated of all

23

legal responsibility by making a Motion in the Hearing which the parents brought to compel an evaluation which was inappropriate to begin with.  It is most unfortunate that this dubious tactic was reinforced by the Hearing Officer when he decided, without any legal authority and with absolutely no evidence upon which to base his decision, to order the evaluations proposed, and ultimately to improperly dismiss the Hearing.  However, the Plaintiffs are confident that the clear procedural rights to which the Plaintiffs are entitled under the IDEA and state statute will not be so easily overlooked by the Court.

For the foregoing reasons, the Plaintiffs respectfully request that the Defendant's Motion for Summary Judgment be DENIED.

The Plaintiffs by

Jennifer D. Laviano
Jennifer D. Laviano, P.C.
77 Danbury Road, Suite C6
Ridgefield, CT  06877
(203) 431-4757
Juris No. 17601

## <u>CERTIFICATION</u>

This is to certify that a copy of the foregoing was mailed, postage prepaid, to the

following counsel of record on this 8th day of April, 2004;

Michael P. McKeon
Sullivan, Schoen, Campane & Connon, LLC
646 Prospect Avenue
Hartford, CT   06105-4286
(860) 233-2141

 

Jennifer D. Laviano
Jennifer D. Laviano, PC
77 Danbury Road, Suite C6
Ridgefield, CT  06877
(203) 431-4757
Fed. No. 17601

25