UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

FILED

2005 FEB 14  P 2: 08

U.S. DISTRICT COURT

P.S.,

      Plaintiff,

v.               :

THE BROOKFIELD BOARD OF
EDUCATION,
      Defendant.

CIVIL ACTION NO.
3:01cv1757 (SRU)

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF
## MOTION FOR RECONSIDERATION

      The Plaintiff has moved this Court to reconsider its MEMORANDOM OF DECISION

dated and filed 1/31/2005, and its accompanying JUDGMENT, and either (1) remand this matter

to the Connecticut Department of Education Due Process Hearings Office in order that testimony

can be taken [from Lois Pernice (the school psychologist and Board designated evaluator, who is

not licensed as a mental-health professional) and other Board witnesses as well as plaintiff's

witnesses, including Robert Colen, PhD. (a clinical psychologist, who is licensed as a mental-

health professional), John Gelinas, M.D. (clinical psychiatrist), Chris Sorenson (a social worker)

and P.S. and the parents], and a finding made on the issue of whether the evaluation requested at

the PPT by Defendant, to be conducted by school psychologist Lois Pernice, would have been

harmful to Plaintiff, because she was not a "qualified professional" as required by this Circuit in

*Dubois v. Connecticut State Bd. of Educ.,* 727 F.2d 44, 49 (2d Cir. 1984),    (hereinafter "The

Issue"); (2) reopen the record in this matter so that Testimony can be taken on

1

The Issue, and this Court can make a finding on The Issue; or (3) review evidence on The Issue already in the record, which this Court may have overlooked, and rule on favor of Plaintiff.

1.    **Since Disputed Facts Exist, This Case Was Not Ripe for an Adjudication on the Record.**

Plaintiff did not concede in its Opposition Memorandum or at Oral Argument that there were no material issues of fact in dispute, from which this Court could issue Summary Judgment in this case, including on The Issue. This Court states: ".   .   .and because the parties agree that this case is to follow the typical procedure in an IDEA case. I see no reason to deviate from the standard of review  .   .   .  giving appropriate deference to the Hearing Officer's determinations." *MEMORANDUM OF DECISION at pp.8-9.* With all due respect, the Plaintiff did not agree to this "typical procedure" or its deferential standard of review, and indeed, the Court's Decision underscores the Plaintiff's position in its opposition papers to the Defendant's Motion for Summary Judgment that disputed facts exist in this case which are *material* issues to the outcome of the matter.  Moreover, viewing those disputed facts in the light most favorable to the Plaintiffs, we submit that the resulting Decision should favor the Plaintiffs.

This is especially so because The Issue involves the parents being repeatedly advised by the treating psychiatric team at both Yale Psychiatric Institute (where P.S. spent three weeks), and the Child and Adolescent Treatment Center, Danbury Hospital, that because P.S. was extremely fragile (still experiencing both auditory and visual hallucinations) an emergency situation existed during the time period at issue – January to March, 1999.  According to the mental health professional advising the Plaintiff's parents at the time, the most important consideration for the **lifelong prognosis of P.S.** was to avoid any situation that might remotely increase the stress of P.S., because this could lead to second hospitalization. The uncontroverted testimony of Parent J.S. was that the Plaintiffs ultimately rejected the testing desired by the

2

Defendant with its obvious delays, during which time P.S. would still be home tutored. His

parents, therefore, privately placed P.S. on an emergency basis:

> ...we knew (P.S.) was in a fragile state and the whole time we were dealing with his care in December and January and February, we understood this was an emergency situation, anything could set him off to be rehospitalized, and my understanding from talking to my wife and Mr. Sorenson was that these tests would take a good month to perform and then, by the time you give the notice and the new PPT, you know, I expected that the earliest that (P.S.) would be placed was a couple of months later, if in fact, the school ultimately agreed to place him at ACCESS. **Based upon what was advised to me from his physicians, that was an unacceptable period. (P.S.) was at risk for being, for having another psychotic break and being rehospitalized. I then contacted (legal counsel) and ultimately this, his, his emergency situation led us to privately place him when it was denied, and in fact, we did do that** and he began the ACCESS school on February 17th. *(Emphasis added).*

> *12-6-1999 HEARING TRANSCRIPT AT PP. 42-43.*

A *judicial* review of whether or not the parents violated the standard of

unreasonableness ought not ignore, as the Hearing Officer did, the uncontradicted medical and

psychiatric evidence of this emergency medical situation that P.S. was in, which will be

discussed infra.

In Plaintiff's Opposition Memorandum, Plaintiff argued that there were material issues in

dispute and that this matter was not ripe for adjudication on the administrative record. See

Opposition Memorandum at pp. 8-9[1], 12-13[2], 16[3], and 17.[4] Since a "judicial finding"[5] (not an

---

[1] See Opposition Memorandum at pp.8-9: "Even assuming, *arguendo,* that the Defendant is correct, and that they do have the obligation to personally evaluate the Plaintiff before identifying him for services, there remains a very real factual question as to whether or not the proposed evaluation of February 10, 1999 met the procedural and substantive requirements of the Act. The Plaintiffs propose that the individual who was to undertake the evaluation of P.S. by the Board, Ms. Lois Pernice, was not a properly qualified professional to assess P.S.'s suspected areas of disability. Moreover, the Plaintiffs maintain that the specific assessments outlined in the consent form do not meet the requirements of 20 USC 1414(b), and also would not appropriately assess P.S.'s suspected areas of disability. Finally, the Plaintiffs maintain that they were not properly and fully informed of the assessment procedures or purposes in the proposed evaluation. These are all disputed, genuine issues of material fact which, assuming the facts in the light most favorable to the Plaintiffs, preclude the issuance of Summary Judgment in the Defendant's favor."

[2] See Opposition Memorandum at pp. 12-13 " However, assuming that the Defendant's interpretation of the law is correct, and that the Board has a virtually unfettered right to evaluate a student with its choice of evaluators, there remain genuine issues of material fact in dispute. The Plaintiffs dispute that the individual selected by the Defendant are properly credentialed and trained to have assessed P.S., and that the assessments selected comply with

3

administrative one) is needed to find the actions of the parents "unreasonable" in denying the

evaluation and privately placing the child, this Court should hear live testimony on The Issue. At

a minimum, this Court should remand this Case to the Connecticut Department of Education

Special Education Due Process Unit for assignment to an Impartial Hearing Officer, so that a

fully developed factual record can be made from which the "judicial finding" of

unreasonableness can be determined. In the alternative, the Plaintiff marshals the evidence on the

administrative record, infra, from which this Court needs to make a "judicial finding" of parental

unreasonableness. The Plaintiffs submit that it is therefore legal error to give deference to the

Hearing Officer on The Issue, and that this Court should make its own decision, based on the

evidence viewed most favorably to the Plaintiff.


2.     **The Evidence Supports a Finding that Defendant's School Psychologist was not
       a "Qualified Professional" to Administer Tests to a Fragile Child Diagnosed with
       Schizophreniform Disorder.**

---

the Act. There has been NO evidence to refute this claim in the underlying Hearing. The Plaintiffs maintain that to
have delayed in evaluating P.S. and to have subjected him to the assessments proposed by the Board would have
caused the Plaintiff serious emotional harm, and the Defendants dispute this. Finally, in order to ascertain whether
the Defendant required additional testing, or if the information provided to the February 10, 1999 was sufficient to
identify P.S. without warranting additional data, there is a factual dispute as to whether that information was provided
to the PPT by the Plaintiffs. These material factual disputes also, when viewed in the light most favorable to the
Plaintiffs, compel denial of Summary Judgment."
     [3] See Opposition Memorandum at p. 16: "Viewing the alleged facts in the most favorable manner to the
Plaintiffs, a legitimate issues exists as to whether or not the Defendants failed to properly and timely evaluate the
Plaintiff."
     [4] See Opposition Memorandum at p. 17: "The Defendant also cites 20 U.S.C. 1412(A)(10)(B)(iii)(III) as
another basis upon which reimbursement should be limited in this matter. This provision provides that a parents'
unilateral placement costs may be reduced or denied 'upon a judicial finding of unreasonableness with respect to
actions taken by the parents.' At the outset, it is important to note that this is the ONLY reimbursement limitation
section which requires a 'judicial finding', rather than merely a determination by a Hearing Officer. Accordingly, as
the allegations which the Defendant cites as a basis for this finding are absolutely disputed by the Plaintiffs, we have
yet another instance of a disputed, material, and genuine fact."

     [5] See footnote 4, supra, which cites 20 U.S.C. 1412(A)(10)(B)(iii)(III), for the necessity of a judicial finding.

*A. The Defendant did not seek a comprehensive evaluation*

In discussing the evaluation desired by the Defendant, prior to any identification of P.S. as eligible for special education services under the IDEA, this Court indicates that the Defendant's PPT involved a "proposed psychological evaluation" by the school psychologist. *MEMORANDUM OF DECISION at p.11.* This is factually incorrect. The PPT consent form[6], signed by the parent, M.S., and later revoked, did not provide for a "comprehensive evaluation" of P.S., as Special Education Director Malinda Murchie admitted in uncontroverted testimony:

> Q    Well, the question is, did you ask to have a comprehensive evaluation? It seems to me that what you asked for is a series of tests, only by a school psychologist. In light of what you knew on February 10th, 1999, do you consider what's set forth on Exhibit 9 to be an appropriate and comprehensive evaluation for (P.S.)?
>
> A    We also asked --
>
> Q    Excuse me. The question is very simple. On Exhibit 9, you list the tests and evaluation procedures and who's to do it. There's a simple question before you is, is what's set forth on Exhibit 9, in your view, a comprehensive evaluation for (P.S.), yes or no?
>
> A    No.

*12-2-1999 HEARING TRANSCRIPT AT PP. 141-142.*

Therefore, the Defendant never put in question the medical diagnosis of P.S. as suffering from Schizophreniform Disorder because the PPT never requested a comprehensive evaluation "to determine whether a child is a child with a disability." 20 USC 1414(a)(1)(B)(i) The proposed evaluation was not capable of ruling in, or out, the "suspected area of disability" as required by 20 USC 1414(b)(3)(C), because the proposed assessments (IQ testing, achievement testing, and "projectives) could not have led to a confirmation or rejection of the diagnosis of schizophrenia. Given this fact, the Defendant should have followed Connecticut Department of Education

---

[6] Attached hereto as Exhibit A. The IDEA requires that school districts obtain written and informed consent from parents before they undertake ANY evaluation of a student (20 USC 1414(a)(1)(C)), and the consent form must specify all proposed testing AND inform parents of their right to *revoke consent.* 34 CFR 300.500  Therefore, despite arguments made by the Defendant to the contrary, as a matter of fact and law the Defendant did not request the Parents' consent for any evaluations *other than those* specifically listed on the form.

Policy, Series: 1983-84 Memo No: 56, attached hereto as Exhibit B, which was drafted to deal

with this exact situation.

> B. *By disregarding Connecticut Department of Education Policy, Series: 1983-84
> Memo No. 56, and failing to identify P.S. at the PPT, the Defendant abused its
> discretion in insisting on an evaluation, not for programming, but for an
> identification evaluation*

With a fair reading of the facts, this Court can only conclude that the Defendant must

have accepted the Yale Psychiatric Institute diagnosis of Schizophreniform Disorder, as it did not

seek a comprehensive identification evaluation. The acceptance of the diagnosis should have

triggered

Connecticut Department of Education Policy, Series: 1983-84 Memo No: 56, which was drafted

to deal with this exact situation:

> The policy stated below applies to local school districts when one of their students
> is placed in one of the following facilities: …the Yale Psychiatric Institute…At
> certain points in their lives, the medical *or* psychiatric needs of children may be
> so severe or pressing that they override concerns about special education. In
> many cases children may require the <u>immediate provision</u> of twenty-four hour
> medical and/or psychiatric care as determined by a licensed physician. Instances
> of the latter could involve self-destructive acts, prepsychotic and psychotic states,
> and other medical/health related emergencies Decisions concerning medical
> and/or psychiatric care are clearly the responsibility of a child's parent or
> guardian. . . . Since the placement of a student at any of these facilities is
> primarily for emergency medical and/or psychiatric reasons, the medical need
> supersedes the need for special education. <u>Because of the emergency nature of
> such placement, the local board of education need not have been consulted prior
> to the placement; however, the local board of education remains responsible for
> the child's education.</u>
>
> **Any student admitted to these facilities for medical and/or psychiatric
> reasons should be classified by a local board of education as a student
> requiring special education as defined 1n Section 10-76a of the General
> Statutes and its regulations.** The local school district, in collaboration with the
> educational staff of the Institution, is responsible for the development of an
> appropriate Individualized Education Program (UP) for each student 1n residence.
> *(Emphasis in original, except bold added).*

The defendant was informed shortly after P.S. was admitted to the Yale Psychiatric Institute.[7] Why didn't the Defendant fulfill its obligations to co-ordinate with Yale and provide education to P.S. while he was at Yale? When asked this question, Special Education Director Malinda Murchie stated in uncontroverted testimony that P.S.'s medical condition was "too serious" to provide education while at Yale:

> Q    ....what do you believe your responsibility, or the team's responsibility is to a child who is suddenly hospitalized, may be in an emergency situation, and you haven't had a chance to evaluate him? Do you believe that the school system has any immediate programming responsibility for that child?
> A    Yes, I do.

*12-2-1999 HEARING TRANSCRIPT AT PP. 131.*

> Q    Okay. So he wasn't getting any educational services in the hospital, either hospital?
> A    I don't think he did.
> Q    Okay.
> A    But I think he was very serious at that time.
> Q    I'm sorry?
> A    I'm thinking he was very serious at that time.

*12-2-1999 HEARING TRANSCRIPT AT PP. 133.*

This serious psychiatric condition was not in dispute at the PPT meeting, explaining why the Defendant did not request a comprehensive evaluation. Mr. Chris Sorenson, a member of the psychiatric treatment team at the Child and Adolescent Treatment Center, Danbury Hospital, described P.S.'s condition in uncontroverted testimony as follows:

---

[7] Parent J.S. testified:
> Q    What, if anything, occurred after (P.S.) was placed at Yale Psychiatric with regard to communication with the Brookfield Public Schools?
> A    He arrived on the 17th, and I would like to talk about that, but my next communication with Miss Nana (the homebound tutor) would have been the week of December 21st. I called her and explained to her that it was explained us at Yale Psychiatric that he'd undergone a full-blown and complete psychotic break and that he was going to be hospitalized for several weeks. They didn't know exactly when he would be discharged. *12-6-1999 HEARING TRANSCRIPT AT PP. 22-23.*

Q       Okay, at the time you had that conversation with Ms. Nana, what was your impression of how (P.S.) was doing in the CATS program during the day?

A       He was having a slow start. He was laying back and I think a lot of that was due to his anxiety, and again, he had come out of Yale Psychiatric Institute absolutely not stabilized on his medication, and Dr. Gelinas worked with him on changing around dosages of medication and such, to get him to be in a calmer, more relaxed state, but (P.S.) was still continuing to have some of his other symptoms, such as hallucinations, delusions, that were often brought on by stress and anxiety.

*12-6-1999 HEARING TRANSCRIPT AT PP. 73-74.*

Given the fragile state of this child, Connecticut Department of Education Policy, Series: 1983-84 Memo No: 56, should have been followed by the Defendant at the PPT, which would have resulted in an identification of P.S. as eligible for service under the IDEA. This policy is the controlling education policy, and there is no evidence that the SDOE ever retracted or withdrew this policy, only that it later elaborated on it.

*C. Given the serious nature of the diagnosis of Schizophreniform Disorder, as well as the fragile state of the child, the school psychologist was not a "qualified professional".*

The school psychologist, chosen by the Defendant to administer the non-comprehensive evaluation, is not a mental-health professional or an individual trained to diagnose a serious medical condition such as Schizophreniform Disorder[8]. In Connecticut, a "school psychologist" is certified by the Connecticut Department of Education. A *psychologist*, on the other hand, is a mental-health professional licensed by the Connecticut Department of Public Health. Compare *Connecticut Agency Regulations § 10-145d-559* for a school psychologist, with *Conn. Gen. Stat.*

---

[8] The fact that after the Due Process Hearing was commenced, the Defendant sought an educational evaluation with this same school psychologist only compounds the error of choosing an educational professional to evaluate a serious mental illness. While Ms. Pernice may be an appropriate, even stellar, school psychologist, she is simply not a psychologist or a mental health professional…she is an educational professional. The IDEA contemplates many situations in which a school district must concede that certain disabilities are outside of their area of expertise, which is why, for example, medical diagnosis is a "related service" under the Act. 34 CFR 300.24(a) At the March 8, 2000, Hearing the Defendant continued to request this type of educational, rather than psychological or psychiatric, evaluation.

*§ 20-188 and its regulations, Connecticut Agency Regulations § 20-188-1 (entitled*

*"definitions"); § 20-188-2 (entitled "Doctoral educational standards for Connecticut*

*psychology licensure") and § 20-188-3 (entitled "Post-doctoral experience standards for*

*Connecticut psychology licensure").* The fact that Ms. Pernice was not a mental-health

professional was established at the hearing in the uncontroverted testimony of Special Education

Director Malinda Murchie:

> Q    Okay.  Now, could you tell me what position L. Pernice held, as of
> 2/10/99?
> A    She holds two positions with the system, school psychologist and Special
> Ed. department head for Brookfield High School.
> Q    Okay.  Do you have her curriculum vitae anywhere?
> A    I'm sure I do.  She was hired before I came into the system, but I'm sure
> we have that.
> Q    Would that be something that would be in your office in a personnel file?
> A    Probably in the personnel file.
> Q    Which is in this building?
> A    Yes.
> Q    Okay.  Do you know if she's doctorally qualified?
> A    No, she is not.
> Q    Okay.  Do you know if she's licensed as a clinical psychologist in the state
> of New York or Connecticut?
> A    No, she is not.
> Q    Is she a certified school psychologist?
> A    Yes, she is.
> Q    Do you know if she has a Master's degree?
> A    Yes.
> Q    She does have a Master's degree?
> A    Yes.  I'm going to retract.  I don't know that.

*12-2-1999 HEARING TRANSCRIPT AT PP. 100-101.*

It is a common assumption that a "school psychologist" is a "psychologist", but the licensure and

training is dramatically different.  Dr. Colen, a licensed clinical psychologist, testified as to why

a school psychologist is not a "qualified professional" to conduct an evaluation of a child with

Schizophreniform Disorder in uncontroverted testimony:

Q    You've done other work for school boards, too, haven't you?
A    That's correct.
Q    You've been a consulting psychologist and testified in Special Education cases?
A    Yes, I have.
Q    You've testified in DCF and Superior Court cases?
A    Yes, I have. .   .   .   .

Q    Now, I know we have your resume, here, and one of the issues here is whether the, which I'm going to ask you to speak to, is whether the evaluations and personnel asked to do those evaluations by the Brookfield Public School, whether that was a comprehensive evaluation for somebody with (P.S.)'s experience at Yale and the problems that presented?  Can you keep that in mind for a second?
A    Uh-hmmm.
Q    Okay, now what I want to know is, is there anything in your background by way of clinical experience that gives you some clinical experience as well as education and dealing with schizophrenia?
A    Well, in addition to my private practice where I've evaluated youngsters and adults with these kinds of problems, specifically schizophrenia, more significantly perhaps, I've worked for the past 20 years for the State of Connecticut as a psychologist at first at Fairfield Hills Hospital in Newtown, which is, was the State Psychiatric Facility for the Western area of Connecticut, dealing with people with severe mental illnesses, primarily schizophrenia, and I did that for 13, 14 years, and then when the hospital was about to close, I moved to the community into Stamford and I work with the same population now in the community. Again, I, it's largely a schizophrenic population.
Q    Could you hazard a guess or an educated opinion as to how many schizophrenics you've worked with over the past 20 years?
A    Easily, thousands, we're talking about.  This is over a 20-year period. .   .   .   .
Q    Let me ask you this.  You know a little bit something about school psychologists, don't you?
A    Yes, I do.
Q    Isn't your wife the school psychologist in New Canaan?
A    Yes, she is.
Q    Okay, and doesn't she, in her non-working hours, work with you in educational evaluations?
A    Yes, she does.
Q    Okay, and so you've had personal experience in what it takes to become and perform the job of school psychologist?
A    Yes, I do.
Q    And you have to work with the school psychologist and some tasks are assigned to her and some are assigned to you, correct, in your practice?
A    That's correct.
Q    Now, what's the difference between your credentials as a clinical psychologist, vies a vie, schizophrenics, and the credentials of a good school psychologist?
A    Well, a good school psychologist might have a background, as my wife does, in Projective testing, Personality testing and then diagnostic work.  So, there's some,

10

there's some training for some school psychologists in that area, but the
experiences in terms of the population they work with, typically is a more normal
population and you're not going to see the variety, extent of people with
schizophrenic disturbance as you would in the clinical setting.

The incidence of schizophrenia is perhaps one percent, so we're talking about a
school system, at that age, if there is any manifestation of the illness in any of the
youngsters, it's not going to be readily apparent until they become later
adolescents and early adult, into early adulthood. So, the school psychologist is
not going to see that population, typically, and not probably going to have much
experience working with that population.

Q     Okay, and that's just a matter of statistics, not a matter of training, correct?

A     Exactly.

Q     Now, is there any training that a licensed clinical psychologist has that a school
psychologist doesn't have in terms of what it takes to achieve that licensure which
would give them any, any leg up in terms of being a more appropriate evaluator
for a schizophrenic?

A     Well, for instance, my training I did, and did my internship two years in a
psychiatric hospital, working with severely mentally disturbed patients, the largest
schizophrenic population.

I can't speak for the, all school psychologists, but I would assume based on my
understanding, many of them have their experiences in school settings and there
would not a heavy loading if at all, in a psychiatric clinical setting.

Q     Does it matter whether you've seen four or five or ten, or whether you've seen
hundreds, in terms of your ability to deal with the educational needs of a
schizophrenic?

A     I would say, absolutely. I mean, you have to know the population to make
recommendations about treatments and disposition.

*12-3-1999 HEARING TRANSCRIPT AT PP. 7, 9-14*

John Gelinas, M.D. also explained, in uncontroverted testimony, about the result of an

unqualified person testing P.S., given his condition:

Q     Okay. Let me ask you this, regarding the subject of an evaluation of (P.S.), is
(P.S.) the kind of child, where if he were evaluated inappropriately, or by the
wrong person, it might subject him to some kind of danger?

A     Well, I think that's true for many children, in many cases. And I think for (P.S.), I
think you could do some harm, maybe even unknowingly, by interviewing him in
a way that might be too -- too anxiety provoking for him. . . .

Q     What kind of symptoms might they be in, your professional opinion, and how might
they affect either his safety or that of the other children or his performance?

A     (P.S.) suffers from a psychotic disorder, in which he experiences intermittent
psychotic symptoms, hallucinations. Auditory hallucinations, he hears things that
aren't there. Visual hallucinations, he sees things that aren't there, often very

11

graphic. Delusions, at times. And he also can be anxious, sometimes very anxious. And his anxiety level's directly associated with his psychotic symptomatology. The more anxious he becomes, the more likely he is to experience psychotic symptoms. In those circumstances, his performance, academically, is very tenuous. Psychologically, it's something that requires evaluation.  .  .  .

*3-8-2000 HEARING TRANSCRIPT AT PP. 19, 39.*

The parents legitimately feared for the safety of P.S. if an improper and inappropriate evaluation

had been conducted by the Defendant. The Parent M.S. and Mr. Chris Sorenson had observed at the

PPT the fact that the members of the PPT (including most importantly the school psychologist—

who was the Defendant's proposed evaluator) had not been able to recognize that the discussions at

the PPT were making P.S. suffer anxiety and psychotic symptoms. This lack of insight into the

disorder suffered by P.S. continued to occur *even during a conversation with P.S.* during the PPT.

Mr. Sorenson, in uncontroverted testimony, explained first his ability to spot P.S. suffering a

psychotic symptom and then the fact that P.S. did suffer such symptoms at the PPT meeting:

> Q    And before we just leave this, when, when, in your experience with (P.S.) when he would have one of these episodes, how could you tell he was having an hallucination? What would trigger your response if there was one?  .  .  .
>
> A    On the outside, I would be able to see that sometimes he would become even more shut down. Not a true catatonic state where he's not responding at all, but his verbal and physical activity would sort of close down quite a bit and he would look scared and anxious and confused.  .  .  .
>
> Q    What, if anything, do you recall for the time that (P.S.) was there, about (P.S.)'s reaction to the meeting?
>
> A    Well, (P.S.) looked to me to be anxious and nervous, as he was. I was accustomed to him being in group. The administrators at Brookfield's, I'm not sure who asked him what he thought about this plan.
>
> Q    When you say this plan, what is it you're referring to?
>
> A    The plan of Brookfield High School for him to get into the Center School.
>
> Q    Okay.
>
>      COURT RECORDER: Excuse me.
>
> Q    -- and you were saying that, that it eventually got around to (P.S.) as to what he thought about the plan of him going to Center School.
>
> A    Yeah, and he said, sort of like I'll go along with that, but that wasn't what he wanted to say. He was, his mother and I, knowing (P.S.), I think a lot

12

better than the others, were able to pick up on his anxiety and he told me
afterwards when I asked him about it, because he had been wanting,
telling me at the facility, I want to go to ACCESS, I like it here.
He said afterwards, that he was unable to disagree with the plan of the
Brookfield administrators. That he had wanted to, but he was unable to.
And I remember we spent a couple of days after that in treatment where
that was the issue of the day for (P.S.), and eventually, he was able to tell
me and tell some of his peers at the program, that what I want to do is
come to the ACCESS program because I feel safe and comfortable here
and I know the people.
And he also let me know that his impression of the kids in the Center
School was that, you know, they were, they were a lot of acting out kids
there, and he was afraid to go there. But again, he said, I couldn't tell
them that in the meeting.

*12-6-1000 HEARING TRANSCRIPT AT PP. 82, 86-87*

Parent M.S., in uncontroverted testimony, confirmed this suffering by P.S. at the PPT meeting:

A     Well, I was very upset. We left the [PPT] meeting, and I remember
      walking to the parking lot, (P.S.)'s next to me. He was, like, going
      catatonic at the meeting. He was stressed out at it.

*9-1-1999 HEARING TRANSCRIPT AT PP. 54-55.*

The Plaintiff's father, J.S. had a conversation with P.S. the night of the PPT, which confirmed

the Parents' worst fears about the proposed evaluation, the PPT, and the necessity of an

emergency private placement:

Q     Okay, now when did, when did (P.S.) begin school at ACCESS?
A     I believe on or about February 17th.
Q     Okay, what was your understanding as to that program, what it constituted,
      how many classes he has, sort of describe the program for us.
A     They explained to us that there was about 15 kids in the program, there was
      an opening at that time for (P.S.), where there were 14 at the time. And that
      they would take his Immaculate textbooks and all of his subjects, and, and
      do, do lesson plans and teach him that curriculum. Obviously, the benefit of
      having him there was that he could, there's no way at that point, he could be
      mainstreamed. He couldn't sit there and listen to a lecture for 45 or 50
      minutes and they would take him through the lesson on the level that he
      could deal with it at that time. Physically, he had to take lots of breaks, he
      had to lie down, you know, they, they were having CATS in the same
      building, they were able to administer his medicine to him. So, it was, it was

13

a medical setting, a psychiatric setting, where he could do schooling and have interaction with other children, with his peers so he wouldn't feel isolated. And we were told that this, with this particular psychiatric illness that isolation was not good for him that he needed to be among his peers in a, in here it would be in a controlled setting and (P.S.) was very happy. **You know, he told me that night, the night of the 10th, Dad, you're not going to let them put in the Firehouse.[9] He was scared to death and it was the exact, and I mean, I was, I was seeing living out exactly what the doctors said I couldn't let happen. I couldn't let him get stressed out because he would have another psychotic break. So, I felt at that point, I had to do something immediately to deal with this. I could not let this kid get jerked around for a couple of months, continue home tutoring or even allow the possibility of him being placed in the Alternative School. So, I contacted council, and then made a request for a hearing and privately placed him. I felt I had no choice but to privately place him.** *(Emphasis added).*

*12-6-1999 HEARING TRANSCRIPT AT PP. 44-46.*

The finding by the Hearing Officer, and affirmed by this Court, that there was "no evidence" that

the evaluation by Ms. Pernice would have harmed P.S. is not supported by the record, and is

based on a factual determination which is both disputed and which should be viewed in favor of

the Plaintiffs. At no time did the Defendant offer testimony by Ms. Pernice that she had

recognized the psychotic symptoms P.S. experienced at the PPT.   The parents could not allow a

person to test this fragile child who was not trained to recognize the signs of an oncoming

psychotic episode; indeed, the school psychologist recommended by the Defendant did not even

recognize his suffering psychotic symptoms at the PPT.   The IDEA, and Act whose purpose is

"to ensure that the rights of children with disabilities and their parents are protected" (34 CFR

300.1(b)) does not require such a Hobson's choice.

> *D. Given the serious nature of the diagnosis of Schizophreniform Disorder, as well as the fragile state of the child, the PPT's failure to identify and place P.S. at the ACESS school, and instead to require inappropriate testing, which would lead to at best to a two to four week or more delay prior to the next PPT meeting, would have harmed the Plaintiff, as P.S. faced an emergency situation which*

---

[9] The Firehouse is the nick-name for the alternative high school program recommended by the Defendant at the PPT.

> *required immediate identification and immediate placement at the ACCESS*
> *school.*

John Gelinas, M.D., in uncontroverted testimony, explained that this testing delay, and a

failure to immediately made a proper educational placement of the Plaintiff, placed P.S. at risk for

second psychotic break:

Q        What kind of regression would be a reasonable, medical probability to be induced
          by, continuing just for the home tutoring program?

A        I think his anxiety symptoms would have worsened and I think his thought
          disorder would have worsened. I think he would have been more delusional,
          more acutely delusional, the quality of the delusions, I think, would have been
          worse and I think he would have been hearing the same things that weren't there
          more often and to a more severe degree.

Q        Maybe this is a stupid question, but I think I should have it on the record, anyhow.
          Do thought disorders, delusions and anxiety have an adverse affect on education
          performance?

A        Absolutely.

Q        Now, I'm going to ask you that question that I asked you before. Is there anything
          I haven't asked you about Peter that you think it's essential to inform the Hearing
          Officer as to the job the has to do, which is to pick an appropriate educational and
          -- an educational placement and program for Peter?

A        I just want to underscore that I think that there is an acute nature to this that I
          don't think should be underestimated. That, in my opinion, Peter needed the
          comfort and it's a day long program of education and mental health treatment to
          not regress, so that he would need further hospitalization or he would experience
          worsening symptoms.

*3-8-2000 HEARING TRANSCRIPT AT PP. 77-78*

Robert Colen, PhD, agreed with this analysis, in uncontroverted testimony:

Q.       Is there research as to the importance of timely interventions when you have an
          adolescent, adolescents schizophrenic?

A        Yes, there is.

Q        Could you explain that to the Hearing Officer, please?

A        There's been a good deal of research lately in terms of early intervention with the
          adolescent schizophrenic population. The importance of a quick diagnosis, quick
          intervention, quick treatment, and the evidence, the research evidence, seems to
          suggest that there's less of a debilitating pattern with the illness if there's a quick
          intervention, early on, and this has been well documented as a psychiatrist, or
          Liebermann from the Chapel Hill University of North Carolina. He has done a

good deal of work in that and they're many others who have and have shown consistently that it's important to identify early and treat early. One major theory seems to be that, that stress can exacerbate the symptoms of the mental illness, so if the illness is contained and the stress is minimized, then there's a better prognosis afterwards.

Q    Okay. Knowing (P.S.), would simply providing a home tutor be sufficient to alleviate the stress and deal with it in a, in a through and comprehensive manner?

A    No. In fact that would be very risky. Coming out of a hospital, being cut off from his school environment, his school setting that he's familiar with, staying at home, there's a very high, what we call co-morbidity in schizophrenia, of depression.

In addition to being, having schizophrenic symptoms, the person can show elements of depression. Of course, suicidality becomes important, and, and I told the parents that I was concerned about that with (P.S.).

That he, some of his projective stories, and I believe it's in the report, there was a suicidal content to his stories and so the concern I had would be that if he were home, it tends to, when you're isolated at home, it tends to exacerbate depressive features and can make him feel more isolated and could set the stage for a suicidal episode, but even if not that, it would certainly not help him to be in that setting. He needed to be in a treatment setting with support and structure around him.

Q    Was there two weeks to waste, at that time?

A    Again, this is a very high-risk population and when somebody is symptomatic, as (P.S.) was, he was still, it's not as though he went into the hospital and came out symptom free. In my office, as I said, he was still talking about Satan, seeing Satan, he was still pacing, he was agitated. So, when somebody is symptomatic, then anything can happen and we run the risk of something happening, in terms of danger to self and even danger to others. I mean, you can't rule these things out. So, what you want to do is put them in a therapeutic environment where they're monitored, and then in such a setting they can be observed and medications can be altered and adjusted. They can be in group therapy and things that he's had since.

Q    How about transitioning him back to education if he's going to, if he's going to have an appropriate educational setting and be able to get back into some kind of a mainstream. How urgent is there that there be a coordination between a, a professional transitional program and his educational program?

A    With that also that there needs to be a close relationship and close communication between the two and my understanding is at Danbury Hospital they have both elements there, so there would be that link.

Q    And is that urgent?

A    I believe it was very urgent. You know, as I say, he was high-risk at that point.

Q    Are you aware of any person from this public school or any school system or any expert who has ever expressed an opinion that as of February of 1999, the situation to get (P.S.) into an appropriate program was not urgent?

A    Well, I spoke to Dr. Gelinas and he certainly supports this notion, as well. He felt he was very fragile at that point and very vulnerable. So, he also felt he needed to be in a structured therapeutic setting.

16

*12-3-1999 HEARING TRANSCRIPT AT PP. 25-30.*

The acute situation that P.S. was in at the February 10, 1999 PPT meeting can not be understated. Appropriate judicial review of the administrative record can only reasonably lead to a rejection of the Hearing Officer's findings and an order requiring the Plaintiff be reimbursed for the tuition for the year which P.S. attended ACCESS, the spring and fall of 1999.

THE PLAINTIFF, P.S.

Respectfully submitted,

By: _____

Jennifer D. Laviano
Jennifer D. Laviano, P.C.
77 Danbury Road, Suite C6
Ridgefield, CT 06877
(203)431-4757
Juris No. 17601

17

## BROOKFIELD PUBLIC SCHOOLS
## BROOKFIELD, CT.

### NOTICE AND CONSENT TO CONDUCT AN INITIAL EVALUATION

Date: _7/10/99_

Dear _Mrs. Secola_.

Your child _PETER_____ . _6/20/83_ has been referred for an evaluation to determine
             (student's name)            (DOB)
eligibility for special education services. Federal and state regulations require that the school district obtain the written consent
of parents before conducting such an evaluation.

☒ Enclosed is a copy of <u>Procedural Safeguards in Special Education</u>. If you would like an explanation of these procedures, or
   if you have questions about the proposed evaluation, please contact:
   ~~Peter at parent~~ _Malinda Murchie_ at _775-7748_
                    (name)                        (telephone number)

☐ A copy of <u>Procedural Safeguards in Special Education</u> was provided at the meeting when this evaluation was planned.

**This document includes the following rights:**

A.  Parents have the right to refuse consent and, if given, it may be revoked at any time.
B.  Parental failure to respond within 10 school days from the date of this notice shall be construed as refusal of consent.
C.  If contested, your child's current educational placement will not change until due process proceedings have been completed.
D.  Parents have the right to review and obtain copies of all records used as a basis for a referral.
E.  Parents have the right to be fully informed of all evaluation results and to receive a copy of the evaluation report.
F.  Parents have the right to obtain an independent evaluation as part of the evaluation process.
G.  Parents have the right to utilize due process procedures.

☐ The tests/evaluation procedures listed below were recommended

☐ The PPT has recommended that the available evaluation information listed below is sufficient to determine eligibility:
   Reason: (specify) _____

| TEST/EVALUATION PROCEDURE | AREA OF ASSESSMENT | EVALUATOR |
|---|---|---|
| Projectives - | Emotional | L. Pernice |
| WISC III | Cognitive | " |
| KTEA | Achievement | " |
| Bender | Visual Motor | |
| Acute Symptom Measure | SCL-90-R, RADS, STQ | |
| WMS | Memory | |

Special adaptations or accommodations are to be considered when indicated by the student's language, cultural background or
physical status. Adaptations/accommodations required for this evaluation are:

☐ No adaptations/accommodations required

☒ Adaptations/accommodations required: (specify) _limit time if needed_

### PARENTAL CONSENT

☒ I give my consent for the [DISTRICT NAME] Public Schools to utilize the evaluations described above. I understand that
   this consent may be revoked at any time.
   _M.A. Seal_                                          _2/11/99_
   Parent/Guardian Signature                              Date

☐ I do not give my consent for the [DISTRICT NAME] Public Schools to conduct the evaluations described above. I
   understand that the school district must take steps as are necessary, which may include due process proceedings, to ensure
   that my child continues to receive a free appropriate public education.

   _____                      _____
   Parent/Guardian Signature                              Date

### EXHIBIT A

Series:   1983-84
Memo No:  56

CONNECTICUT STATE DEPARTMENT OF EDUCATION
Division of Elementary and Secondary Education
Bureau of Student Services
Hartford, Connecticut

TO:        Directors of Special Education and Pupil Personnel Services
           Directors of Approved Medical/Psychiatric Care Facilities

FROM:      Tom B. Gillung, Chief

SUBJECT:   Policy Concerning Legal and Fiscal Responsibility for Children
           Placed in Certain Hospitals without Local Education Agency Prior
           Approval

DATE:      28 December 1979, Revised and Re-issued, 24 July 1984

The policy stated below applies to local school districts when one of their
students is placed in one of the following facilities: Hall-Brooke Hospital,
Westport; Elmcrest Psychiatric Institute, Portland; The Institute of Living,
Hartford; the Yale Psychiatric Institute (Cedarhurst), New Haven; Newington
Children's Hospital, Newington; the Center of Progressive Education (COPE),
New Haven, (sponsored by the Department of Psychiatry, Yale University School
of Medicine); or Children and Adolescent's Psychiatric Service, Mt. Sinai
Hospital (Woodstock School).

At certain points in their lives, the medical or psychiatric needs of children
may be so severe or pressing that they override concerns about special
education.  In many cases children may require the immediate provision of
twenty-four hour medical and/or psychiatric care as determined by a licensed
physician.  Instances of the latter could involve self-destructive acts,
prepsychotic and psychotic states, and other medical/health related
emergencies.  Decisions concerning medical and/or psychiatric care are clearly
the responsibility of a child's parent or guardian.

The facilities listed above furnish medical and/or psychiatric care and
services to such children and all have established a state-approved school
providing special education.  The facility must inform the responsible local
school district of the admission of a youngster as soon as possible, so as to
guarantee a smooth and efficient transfer of educational services.  Eligibility
for special education and/or related services requires that the medical/-
psychiatric facility inform the local school district that the student will be
in residence for three or more weeks.  This is in conformance with Section
10-76d-15, Homebound and Hospitalized Instruction, Regulations of Connecticut
State Agencies.

**EXHIBIT B**

P-1(a₁)

ST DEPT ED/DUE PROCESS Fax:860-807-2049          Mar 9 '00   8:24   P.03/03

Since the placement of a student at any of these facilities is primarily for
emergency medical and/or psychiatric reasons, the medical need supersedes the
need for special education. Because of the emergency nature of such place-
ment, the local board of education need not have been consulted prior to
placement; however, the local board of education remains responsible for the
child's education.

Any student admitted to these facilities for medical and/or psychiatric
reasons should be classified by a local board of education as a student
requiring special education as defined in Section 10-76a of the General
Statutes and its regulations. The local school district, in collaboration
with the educational staff of the institution, is responsible for the
development of an appropriate Individualized Education Program (IEP) for each
student in residence.

Section 10-76d of the General Statutes provides that when a board of education
determines that the special education requirements for a student placed under
the conditions cited above could be met by a program provided within the
district or by agreement with another board of education, except for the
student's need for services other than educational such as medical, psychiatric
or institutional care or services, said board may meet its obligations to
furnish special education for such student by paying the reasonable costs of
special education instruction in a private school, hospital, or other
institution. The local board's responsibility for such students is clearly
limited to the cost of special education instruction and/or related services
specified in the IEP. This should be clearly set forth in the board's written
contract with the facility. Such contract should state that reimbursement for
educational costs will be paid from the date of provision of educational
services as specified in the IEP and not necessarily from the date of
admission. The local school district will initiate a joint PPT meeting with
representation from the medical/psychiatric facility no later than two weeks
from the date of notification of admission by the institution and prior to the
implementation of education services.

When a student is placed in a facility not specifically listed above, which
offers medical and/or psychiatric care and services and has school facilities
which have not been approved by the State Department of Education, the school
district may apply for eligibility for the payment of educational costs as an
exception under Section 10-76d of the Connecticut General Statutes.

If prescribed educational services are to be reimbursable pursuant to the
provisions of state law, they may only be provided in accordance with the IEP
developed by the board's Planning and Placement Team in collaboration with the
educational staff of the institution.

TBG/mga


2055M



P. 10(2)

## CERTIFICATION

This is to certify that a copy of the foregoing was mailed, postage prepaid, to the following counsel of record on this 14th day of February 2005:

Michael P, McKeon
Sullivan, Schoen, Campane & Connon, LLC
646 Prospect Avenue
Hartford, CT  06105-4286
(860)233-2141

_____
Jennifer D. Laviano

18